**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**AZURITY PHARMACEUTICALS, INC.,**

**Plaintiff,**

**v.**

**SHEILA BHATTACHARYA,**

**Defendant.**

**CASE NO.:**

**COMPLAINT AND APPLICATION FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Azurity Pharmaceuticals, Inc. brings this action for preliminary and permanent injunctive relief and monetary damages against Defendant Sheila Bhattacharya.

## PRELIMINARY STATEMENT

**1.** Bhattacharya is a former employee of Azurity. She, along with two of her colleagues, recently joined one of Azurity's competitors, Shorla Oncology, Inc. ("Shorla"). Both Azurity and Shorla develop and market pharmaceuticals. In particular, Shorla markets a product called Jylamvo that directly competes with Azurity's Xatmep in the liquid pediatric oncology medication market.

**2.** Prior to her departure from Azurity, Bhattacharya improperly maintained Azurity's confidential information and trade secret information by circulating various materials to her personal email address without returning such

materials as was required when she separated. After her separation, she solicited former colleagues in violation of restrictive covenants she agreed to as part of her continued employment.

**3.** Azurity brings this action to protect its confidential information and trade secrets and to prevent Bhattacharya from using such information to her own advantage, to enforce her non-solicitation obligations, and to remedy related wrongful conduct by Bhattacharya.

## PROCEDURAL AND JURISDICTIONAL FACTS

### THE PARTIES

**4.** Azurity is a Delaware corporation with its principal place of business located at 8 Cabot Road, Suite 2000, Woburn, Massachusetts, 01801.

**5.** Bhattacharya is an individual and citizen of Florida whose last known principal residence was at 1032 Royal Pass Road, Tampa, FL 33602.

**6.** Simultaneous with this Complaint, Azurity is separately initiating two additional actions against Defendant's co-conspirators: (1) an action in the Eastern District of Pennsylvania against Michael Gitomer ("Gitomer"), and (2) an action in the Western District of Pennsylvania against Kimberly Deacon ("Deacon").

### JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over the parties and this action pursuant to 28 U.S.C. § 1331 because it raises federal questions, specifically claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

**8.** This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Azurity and Bhattacharya. Azurity is considered a citizen of Delaware and Massachusetts, and Bhattacharya is a citizen of Florida. The amount in controversy exceeds $75,000, exclusive of interest and costs, based on Azurity's claims for injunctive relief, monetary damages, attorneys' fees, and other relief arising from Bhattacharya's alleged misappropriation of trade secrets.

**9.** The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because the state-law claims are so related to the federal claims that they form part of the same case or controversy.

**10.** The Court has personal jurisdiction over Bhattacharya because she resides in Florida.

**11.** Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Azurity's claims occurred in the Middle District of Florida, and Bhattacharya is subject to this Court's personal jurisdiction with respect to this action.

## STATEMENT OF FACTS

### NATURE OF AZURITY'S BUSINESS AND COMPETITIVE ENVIRONMENT

**12.** Azurity is a privately held specialty pharmaceutical company headquartered in Woburn, Massachusetts.

**13.** Azurity develops and commercializes innovative pharmaceutical products. It focuses on delivering high-quality medicines to overlooked patient populations.

**14.** Azurity specializes in dose-form innovations of established medicines for patients who have unmet needs.

**15.** Azurity maintains a diversified portfolio of more than 50 medicines. Its products span 10 dosage forms and 10 key therapeutic areas, including cardiovascular, central nervous system, endocrine, gastrointestinal, anti-infective, and oncology medicines.

**16.** The specialty pharmaceutical market in which Azurity operates is intensely competitive and rapidly evolving. The global specialty pharmaceutical market was valued at approximately $679 billion in 2024, with forecasts projecting growth to nearly $1.6 trillion by 2033.

**17.** The U.S. pharmaceutical market overall was valued at approximately $632 billion in 2024. It is projected to exceed $1 trillion by 2033. Market participants compete aggressively on the basis of product innovation, pricing, regulatory approvals, and customer relationships.

**18.** Azurity's products are marketed and sold in more than 50 countries worldwide, including the United States.

**19.** Within the United States, Azurity's sales representatives and business development personnel conduct outreach to physicians, healthcare providers, and pharmacies.

**20.** Azurity's primary customers include hospitals, healthcare providers, specialty pharmacies, and pharmaceutical distributors.

**21.** Azurity generates revenue through the sale of specialty pharmaceuticals to healthcare providers and distributors. Its transactions are typically structured as business-to-business agreements, with healthcare facilities purchasing medications to treat their patients.

**22.** Azurity also engages in exclusive distribution partnerships to extend its market reach.

**23.** Due to the highly competitive nature of the specialty pharmaceutical industry, the loss of proprietary business information—including customer relationships, pricing data, and product pipeline intelligence—can cause immediate and irreparable competitive harm.

**BHATTACHARYA'S EMPLOYMENT AND RESTRICTIVE COVENANTS WITH AZURITY**

**24.** Bhattacharya worked for Azurity as a Vice President of Market Access & Strategic Accounts.

**25.** As a Vice President of Market Access & Strategic Accounts for Azurity, Bhattacharya was responsible for supporting multiple product lines while advancing enterprise-wide pricing, reimbursement, and access strategies.

**26.** While Bhattacharya worked at Azurity, Gitomer and Deacon were members of her team with Azurity's Strategic Accounts Team.

**27.** Bhattacharya reviewed, received, and acknowledged Azurity's: (1) Confidentiality, Non-solicitation and Intellectual Property Assignment Agreement; (2) Code of Conduct; (3) Access Control Policy; and (4) Acceptable Use Policy.

**28.** On or about September 2, 2023, Bhattacharya entered into a *Confidentiality, Non-Solicitation and Intellectual Property Assignment Agreement* (Ex. 1, the "Agreement") with Azurity.

**29.** As part of the Agreement, Bhattacharya agreed to the following:

> **1. Protected Interests.** I have been provided information about the Company's line of business and understand what the scope and nature of the Company's business is. I understand that currently the Company is a specialty pharmaceutical company that focuses on innovative products that meet the needs of patients with underserved conditions. As an industry leader in providing unique, accessible, and high-quality medications, Azurity leverages its integrated capabilities and vast partner network to continually expand its broad commercial product portfolio and robust late-stage pipeline. Azurity's patient-centric products span the cardiovascular, neurology, endocrinology, gastro-intestinal, institutional, and orphan markets. I acknowledge that Azurity's line of business, as well as the products and/or services in which I participate, are likely to change over time. I agree that through my position of employment, I will naturally be informed of such changes without any need for amendment or modification of this Agreement.
>
> **a.** The business in which Azurity is engaged is extremely competitive. Azurity has spent and will continue to spend substantial time, resources, and money developing its trade secrets and other Confidential Information, technologies, products and services, training programs, and key business relationships ("Business Investments"). I recognize that these Business Investments are an important and valuable asset to the Company, and give it a critical competitive advantage. As a result of my employment position with the Company, I will receive the benefit of, and access to a portion of the Company's Business Investments that could be used by me to gain an unfair competitive

advantage against the Company and cause it irreparable harm if my conduct is not limited as provided for in this Agreement.

**b.** My skills, education, and/or experience are such that my compliance with the restrictions provided for in this Agreement during and after my employment will not place an unreasonable burden on me or prevent me from earning a living. I agree that the restrictions provided for in this Agreement are narrowly tailored to protect the Company's legitimate protectable interests.

**2. Duty of Loyalty.** In reliance upon my promises in this Agreement, I will be placed or retained in a position of special trust and confidence by the Company. Accordingly, while employed with the Company, I will have a duty of loyalty that includes the obligation: (a) to devote my best efforts to my employment duties, (b) to promptly notify the Company of business opportunities related to the Company's business without pursuing them independently for personal gain without the written authorization of the Company, (c) to avoid competing with the Company, assisting others in their efforts to compete with the Company, or otherwise engaging in conduct or associations that create a conflict of interest pursuant to Azurity's code of conduct and/or similar policy, and (d) to avoid knowingly interfering with key business relationships (such as clients, employees, and suppliers) for the benefit of any person or entity who is engaged in, or preparing to engage in a competing business enterprise.

**3. Confidentiality Obligations.** "Confidential Information" refers to information and compilations of information, in any form (tangible or intangible), related to the Company's business and of value to it that I first gain knowledge of or access to as a consequence of my employment with the Company if the Company has not made it public or authorized public disclosure of it and it is not readily available through lawful and proper means to the public or others in the industry who have no obligation to keep it confidential. Confidential Information, including trade secrets, means information of any kind, nature, or description, that relates to the Company's business and operations or obtained by the Company in the course of its business operations which provides commercial value or has any business advantage and is not generally available to the public. Confidential Information will not lose its protected status under this Agreement if it becomes known through improper means such as unauthorized use or disclosure by Employee or any other person. Confidential Information may include but is not limited to: (i) all customer lists and all contacts at all customers currently

or formerly serviced by the Company; (ii) the expiration dates and terms of all existing and former customer service agreements; (iii) the contents of all proposals for the provision of services to any prospective customer; (iv) the Company's budgeting and forecasting methods and data; (v) information regarding the Company's sales, profit and loss, profit margin, costs, overhead, and other bookkeeping, accounting and financial information; (vi) all information regarding the Company's operations, business development, acquisition and business strategy and marketing; (vii) names and identities of the Company's vendors and suppliers not well known to the trade and all contacts at the Company's vendors and suppliers; (viii) all terms of all contracts with the Company's vendors or suppliers and of all proposals for the supply of goods or services to the Company; (ix) all financial information with respect to the Company; (x) management evaluations of the Company's resources/assets (such as technology, real estate, and employee job performance); and (xi) all third party information provided to the Company on condition that the Company maintain same in confidence and all information developed by Employee or the Company in reliance on third party information. Due to its special value and utility as a compilation, a confidential compilation (like a client list) will remain protected as Confidential Information even if some items of information within the list are in the public domain. Private disclosure of otherwise Confidential Information to parties the Company is doing business with for business purposes shall not cause the information to lose its protected status under this Agreement.

**3.1 Nondisclosure.** I agree that during my employment and for so long thereafter as the information qualifies as Confidential Information under this Agreement, I will not engage in any use or disclosure of Confidential Information that is not authorized by the Company and undertaken for the benefit of the Company.[] This obligation specifically prohibits, among other things, the copying, recreation, use or disclosure of Confidential Information for the benefit of a competitor or on behalf of any person or entity preparing to compete with the Company, and includes use or disclosure of information on social media. I will comply with all Company policies and directives concerning the use, storage, and transfer of Confidential Information, and the protection of attorney-client privilege where it applies. These obligations do not prohibit my use of generally available knowledge, skill and education that is not specific to the Company or its business relationships but is instead knowledge generic to the industry or my profession. Unless prohibited by law from doing so, I will notify the Company as quickly as possible after being served with a subpoena, court

order, or other legal mandate requiring the production of Confidential Information so that the Company can take reasonable steps to protect its interests and will cooperate in same. I will retain no records of Confidential Information after employment ends without written Company authorization to do so. However, nothing in this Section 3.1 shall prohibit Protected Conduct (described in Section 9 below).

* * *

**4. Protective Covenants.** I acknowledge that some activities by me would, by their nature and irrespective of my intent, involve conversion of Company trade secrets and other Business Investments to the unfair advantage of competitors if engaged in shortly after my employment ends. To avoid the irreparable harm that would be caused by conduct of this nature, and **subject to any state-specific modification under Appendix A** that may apply to me, I agree to the following reasonable limitations (collectively referred to as my "Protective Covenants"), after my employment with the Company ends (my "Termination Date"):

* * *

**4.3 Worker Nonsolicit**. For a period of twelve (12) months after my Termination Date, I will not, for the benefit of a Competitor, directly or through assistance to others, participate in soliciting a Covered Worker to leave the employment of the Company or assist a Competitor in efforts to hire a Covered Worker away from the Company without the Company's written approval in advance. "Covered Worker" means an individual employed to provide services to (or on behalf of) the Company that I worked with, gained knowledge of, or was provided Confidential Information about as a result of my employment with Company during the Look Back Period. The restriction created by this paragraph is my "Worker Nonsolicit" covenant.

**4.4 Related Terms and Definitions.** For purposes of this Agreement, the following will apply:

* * *

**b**. **Solicitation Understandings.** It will be presumed that to "solicit" or "soliciting" and their derivations mean to interact with another person or entity with the purpose or foreseeable result being to cause, motivate or induce the person or entity to engage in some responsive action (such as starting, modifying, or ending a business relationship), irrespective of who first initiated contact. It shall not

include general advertising (such as "help wanted" ads) that are not targeted at the Company's employees or clients. If a Covered Worker is hired by a Competitor into a position that reports to or is supervised by me while the Worker Nonsolicit remains in effect, it will be presumed that I was involved in the solicitation or hiring of the Covered Worker in breach of this Agreement. My Worker Nonsolicit and Client Nonsolicit covenants are understood to be reasonably and logically limited by geography to those locations where the subjects (Covered Workers and Covered Clients) are located and available for solicitation and no further geographic limitation is necessary to make these restrictions reasonable. However, if a different form of geographic limitation is necessary to make one of these restrictions enforceable then the restriction(s) that need it for enforceability shall be considered limited to the Restricted Area.

* * *

**d. Fairness Extension.** If I breach one of the Protective Covenants, the period during which I must comply with the Protective Covenant will be extended for an additional period of time equal to the time that elapses from commencement of the breach to the later of (i) the definitive termination of such breach or (ii) the final resolution of any litigation arising from such breach; provided, however, that the period of my required compliance shall not be indefinite and shall be equal in total length of time to the maximum length of time allowed for such Protective Covenant under controlling law, and if this extension would make the restriction unenforceable under controlling law it will not be applied. This shall be referred to as the "Fairness Extension."

* * *

**6. Company Property.** All records related to the Company's business activities and business development efforts created in the course of the Company's business (such as contact lists, prospect lists, calendars and notes), whether made by me or others, and wherever stored (in email, text messages, cell phones, computers or otherwise) are the property of the Company ("Company Records"). I understand that I am not authorized to use these Company Records or to access and use the Company's computers, email, or related computer systems, to pursue competitive business interests. I recognize that accessing Company computer systems to compete or prepare to compete is unauthorized access and strictly prohibited. All electronic files and similar items stored on Company owned, issued, or sponsored devices or accounts are Company property unless otherwise agreed in writing as to a specific

item, and I shall have no expectation of personal privacy with regard to any such stored items. I will preserve and maintain records of Company clients, prospects, suppliers, and other business relationships I have involvement with as Company Records, and will not knowingly use these records to harm the Company's business interests. Upon termination of employment or earlier if requested, I will return all Company property including Company Records and any copies (tangible and intangible, electronic files, email, and otherwise) to the Company. Upon request, I will provide the Company reasonable means to access and verify that no Company Records and/or Confidential Information have been retained by me on personal computers, cell phones, email, or cloud storage accounts, or in any other place that is subject to my control without the Company's authorization after employment ends. Nothing herein prohibits me from retaining records provided to me by the Company concerning my own compensation, benefits, and agreements with Company.

* * *

**8. Special Remedies.** A violation of this Agreement by me would cause not only actual and compensable damage, but also irreparable harm and continuing injury to the Company for which there would not be an adequate remedy at law. Accordingly, if I should breach or threaten to breach this Agreement, the Company shall be entitled to equitable remedies in the form of temporary and permanent injunctive relief to enforce this Agreement in addition to, and not in lieu of, any and all other legal remedies to which it would otherwise be entitled. Where permissible, no bond will be required if an injunction is sought to enforce any of the covenants set forth herein; provided, however, that if a bond is deemed necessary for issuance of injunctive relief to enforce my obligations, a bond of $1,000 shall be presumed sufficient. In addition to, and not in lieu of injunctive relief to prevent further violations, the Company will have the right to recover from me a sum equal to thirty percent of the annual compensation of any Covered Worker that the Company loses as a result of (in whole or in part) my breach of the Worker Nonsolicit. Company shall be deemed the prevailing party for all purposes if any relief is granted to it, irrespective of whether some relief requested by the Company is also denied. In the event that the Company pursues legal action to enforce the terms of this Agreement due to a breach or threatened breach by me, the Company shall be entitled to recover from me all costs and expenses, including without limitation, reasonable attorney's fees and expenses (including expert witness and investigation fees, and court costs) incurred by the Company in

> connection with such litigation, in addition to any and all other rights and remedies; provided, however, that if controlling law would convert the forgoing provision into a reciprocal obligation whereby either prevailing party could recover attorney's fees and expenses, then each party will bear its own attorney's fees and expenses.

**30.** Azurity would not have employed or continued to employ Bhattacharya without the assurances contained in the Agreement.

## BHATTACHARYA'S ACCESS TO CONFIDENTIAL INFORMATION, INCLUDING TRADE SECRETS

**31.** Azurity required its employees, including Bhattacharya, to participate in training regarding the importance of maintaining the confidentiality of its proprietary business information and trade secrets, both during their employment and afterward for as long as the information remains confidential.

**32.** Bhattacharya was instructed on her responsibility to protect the confidentiality of Azurity's proprietary business information, including:

a. All customer lists, customer contacts, and the terms and expiration dates of every customer service agreement—past and present.

b. All proposals for services to prospective customers.

c. Azurity's budgeting and forecasting methods and data.

d. All sales figures, profit and loss data, profit margins, costs, overhead, and other financial, accounting, and bookkeeping information.

e. All information about Azurity's operations, business development, acquisition strategy, business strategy, and marketing plans.

f. The names, identities, and contact information for Azurity's vendors and suppliers - along with every term of every contract with those vendors and suppliers.

g. Management evaluations of Azurity's resources and assets, including technology, real estate, and employee performance.

h. All third-party information provided to Azurity in confidence, and all information developed using that third-party information.

**33.** Bhattacharya was informed that she may not use or disclose any Confidential Information in any way that is not expressly authorized by Azurity and undertaken for its benefit, including by not copying, recreating, using, or disclosing Confidential Information for the benefit of any competitor or anyone preparing to compete with Azurity.

**34.** Additionally, Bhattacharya was directed to return all records containing Confidential Information at the end of her employment with Azurity.

**35.** Azurity's Code of Conduct includes a provision stating that:

> All company-related or company-owned data and information—including data and information on our personal devices—are considered proprietary information and are the property of Azurity. These data and information are subject to inspection, review, and/or collection by Azurity.

**36.** Azurity's Access Control Policy is specifically designed to "provide appropriate security requirements in ensuring the critical business data classified as Secret or Confidential information remains secure" and prohibits non-compliance.

**37.** Azurity's Acceptable Use Policy prohibits the use of personal email accounts for sharing confidential information, backup of Azurity information on unauthorized devices, and requires that all Azurity devices/account access be returned or ceased on an employee's last day of employment.

## <u>AZURITY TOOK REASONABLE STEPS TO PROTECT ITS CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION, AND TRADE SECRETS</u>

**38.** Azurity would not have employed or continued to employ Bhattacharya without her assurances that she would retain the confidentiality of Azurity's information.

**39.** As a Vice President of Market Access & Strategic Accounts, Bhattacharya had access to a great deal of highly confidential information and trade secrets—information that Azurity vigorously protects from competitors.

**40.** The confidential and proprietary information and trade secrets, all of which the Company authorized Bhattacharya to access while serving as Azurity's employee, are highly sensitive, commercially valuable, and would be extremely useful to competitors in their efforts to compete with Azurity for business and market share.

**41.** Azurity invests substantial time, money, and other resources to develop this confidential and proprietary information and takes—and has always taken—reasonable measures to protect it from dissemination to competitors and others outside of the company. These measures include, but are not limited to:

a. encrypting data on company-owned devices with access to company data;

b. password protecting all company-owned devices with access to company data;

c. taking reasonable measures to limit the disclosure and distribution of such information to individuals who need access to such information to perform their job responsibilities; and

d. requiring all employees to affirm that they will maintain the confidentiality of Azurity's confidential and proprietary information and trade secrets.

**42.** Accordingly, the above-referenced confidential and proprietary information and trade secrets are not generally known to the public.

**43.** With access to highly sensitive, confidential, and proprietary information and trade secrets, Bhattacharya has the knowledge necessary to engineer a strategy that would allow a competitor to unfairly and unlawfully compete with Azurity.

## AZURITY'S LEGITIMATE BUSINESS INTERESTS

**44.** Azurity possesses substantial and legally protectable business interests, including trade secrets, confidential business information, customer relationships, and goodwill. These interests are recognized and protected under Florida law, including § 542.335, FLA. STAT.

**45.** Azurity's confidential information and trade secrets include, but are not limited to: customer lists and customer contacts; the terms and expiration dates of customer service agreements; proposals for services to prospective customers; budgeting and forecasting methods and data; sales figures, profit and loss data, profit margins, costs, and overhead; information about Azurity's operations, business development, acquisition strategy, and marketing plans; vendor and supplier identities and contract terms; management evaluations of company resources and assets; and third-party information provided to Azurity in confidence.

**46.** Azurity developed this confidential information over many years and at substantial expense. It maintains this information in confidence and does not make it available to the public or to competitors.

**47.** Azurity's customer relationships are the product of significant investment of time, resources, and effort by its Strategic Accounts personnel teams. These relationships give Azurity a competitive advantage that would be lost if disclosed to or exploited by a competitor.

**48.** Azurity prohibits its employees from using or disclosing Azurity's confidential information in any manner not expressly authorized by Azurity. Employees are further required to return all records containing confidential information upon the termination of their employment.

**49.** More particularly, Azurity's Market Access and Strategic Accounts (MASA) employees are entrusted with access to highly sensitive and competitively valuable information in the ordinary course of their work.

**50.** Strategic Accounts personnel at Azurity have access to account-specific and product-specific pricing strategies. This information is not publicly available and is closely guarded as a trade secret.

**51.** These employees also have access to customer lists, including the identities of and contact information for key decision-makers at hospitals, specialty pharmacies, and healthcare systems.

**52.** Azurity's Strategic Accounts personnel have access to detailed business review insights, product utilization data, contract-performance data, and rebate and chargeback data.

**53.** These employees gain detailed knowledge of Azurity's product pipeline, including planned product strategies and pricing strategies.

**54.** Such personnel develop close personal relationships with Azurity's customers and coworkers. These relationships are built through months and years of repeated contact, trust, and service. They represent substantial goodwill belonging to Azurity.

**55.** The information described above—including pricing models, cost structures, pricing strategies, product pipeline, sales data, rebate or chargeback data, and similar knowledge—along with the goodwill and relationships constitute protectable business interests under § 542.335, FLA. STAT.

**56.** If a competitor were to obtain this information through a former employee, it could use it to undercut Azurity's pricing, target Azurity's existing customers, target Azurity's employees, and gain an unfair competitive advantage. This would cause immediate and irreparable harm to Azurity's business.

## BHATTACHARYA'S MISCONDUCT

**57.** Bhattacharya separated from Azurity on September 2, 2025.

**58.** As set forth above, Bhattacharya had access to Azurity's most sensitive, confidential, and proprietary information and trade secrets, all of which would be highly useful to a competitor.

**59.** Azurity provided Bhattacharya with access to the confidential and proprietary information and trade secrets solely so that she could perform her duties for Azurity, and Bhattacharya's access to and use of this information was expressly subject to confidentiality obligations.

**60.** Unbeknownst to Azurity, and prior to her departure, Bhattacharya retained the confidential and proprietary information and trade secrets.

**61.** Prior to her departure, Bhattacharya e-mailed to her personal e-mail address, middlesister66@yahoo.com, documents that contained Azurity's confidential and proprietary information and trade secrets.

**62.** This included a PowerPoint presentation involving commercial due diligence marked "Private and Confidential" that Azurity commissioned regarding a code-named project concerning a specific pharmaceutical product that included sensitive prescriber insights, payer insights, pharmaceutical treatment parameters, prescriber research, payer research, including research concerning pricing and insurance-coverage options, product-utilization rates, and other sensitive information.

**63.** Bhattacharya also e-mailed a copy of an Oncology Monthly Franchise Alignment Review Meeting PowerPoint Presentation that addressed business strategy and strategic planning, including product budget, net revenues, actual versus projected unit sales, performance by region, top health care provider to target for each region, and related information regarding one of Azurity's pharmaceutical products.

**64.** Confidential and proprietary information and trade secrets like the foregoing give a level of insight into Azurity's operations that no competitor could

otherwise obtain.

**65.** Azurity's strategic business plans for such pharmaceutical products disclose non-public revenue, market share, forecasts, targets, and a candid internal assessment of Azurity's strengths, weaknesses, and planned positioning.

**66.** The confidential and proprietary information and trade secrets show a competitor precisely how Azurity is profitable, where it might be vulnerable, and how it measures success.

**67.** A rival with that plan could use it to underprice Azurity without independently developing the same competitive intelligence.

**68.** The confidential and proprietary information and trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, Azurity's competitors and would provide any such competitor with an unfair competitive advantage if obtained.

**69.** On information and belief based on the conduct of other employees who recently departed Azurity to join Bhattacharya at a direct competitor, Bhattacharya retained other documents of Azurity that contain its confidential and proprietary information and trade secrets.

**70.** Bhattacharya's retention and—on information and belief—use and distribution of the confidential and proprietary information and trade secrets were not authorized by Azurity, were not made in furtherance of Azurity's business, and were not undertaken for any permitted purpose.

**71.** Within the last few months, Bhattacharya became the Chief Commercial Officer of Shorla.

**72.** In fact, Azurity and Shorla directly compete with at least one pharmaceutical product, with Shorla producing a pharmaceutical, Jylamvo, which directly competes with Azurity's product, Xatmep, as both are pediatric oral liquid methotrexate products for acute lymphoblastic leukemia and polyarticular juvenile idiopathic arthritis.

**73.** Gitomer left Azurity's employ on June 5, 2026, and Deacon left Azurity's employ on June 19, 2026, and both have since joined Bhattacharya's team at Shorla.

**74.** Unbeknownst to Azurity at the time, Gitomer and Deacon both began to forward to their personal e-mail addresses confidential and proprietary information and trade secrets.

**75.** Gitomer forwarded materials that included—but were not limited to—business plans, customer account trackers, product-specific pricing, rebate, discount, and 340B information, chargeback transaction records, draft and executed customer and supplier contracting materials, payer and competitive-intelligence presentations, and detailed health-system and pharmacy contact lists containing account notes, product interests, follow-up plans, utilization assumptions, and revenue/reimbursement analyses.

**76.** Of particular note, the materials Gitomer sent himself include materials that reference Azurity's Xatmep—the competitor product for Shorla's Jylamvo.

**77.** Deacon forwarded materials that included—but were not limited to—strategic market-access and account-planning materials identifying priorities, portfolio-access objectives, account goals, headwinds and tailwinds, formulary and contracting strategies, net-revenue priorities, gross-to-net considerations, and launch plans for Azurity's pharmaceutical products; account lists and business-development records reflecting contract status, pricing and rebate issues, formulary-transition efforts, 340B considerations, customer contacts, follow-up instructions, and strategic notes for health systems, specialty pharmacies, correctional pharmacy accounts, and other key customers.

**78.** As with the materials Bhattacharya sent herself, these materials reflect nonpublic information concerning Azurity's strategic objectives, customer relationships, product positioning, and planned tactics for various pharmaceutical products.

**79.** On information and belief based on the timing and circumstances, it appears that Bhattacharya solicited Gitomer and Deacon to leave Azurity's employ and join Shorla and plotted with them to abscond with Azurity's confidential and proprietary information and trade secrets for their own benefit and, indirectly, for the benefit of their new employer, Shorla.

**80.** Because the misappropriation only just came to light, Azurity continues to investigate the extent of the misconduct committed against it.

**81.** On August 7, 2026, Azurity, through undersigned counsel, sent a Cease-and-Desist letter (the "Letter") to Bhattacharya, reminding her of her post-

employment restrictive covenant obligations and demanding that she comply with the confidentiality obligations.

**82.** The Letter informed Bhattacharya that Azurity's investigation had revealed that she improperly forwarded confidential or proprietary and/or trade secret records to her personal email address on multiple dates before her separation.

**83.** The Letter demanded, among other things, that Bhattacharya: (a) acknowledge her awareness of various post-employment obligations; (b) certify that she is not in violation of the Agreement's terms; (c) immediately return to Azurity all physical or electronic copies of confidential information and records in her possession, custody, or control; (d) make all personal email accounts, cloud storage accounts, and personal devices available for forensic examination; and (e) certify that she has not disclosed any of Azurity's confidential information to Shorla or any third party.

**84.** Bhattacharya has failed to respond to the Letter by the imposed deadline.

## AZURITY'S ENTITLEMENT TO INJUNCTIVE RELIEF

**85.** Azurity has clearly ascertainable rights requiring protection, including the rights to preserve and maintain the integrity of its confidential and proprietary information and trade secrets together with the goodwill and market share it expended significant time and resources to create.

**86.** Bhattacharya is prohibited from, among other things, retaining, disclosing, or using Azurity's confidential, proprietary information and trade secret information.

**87.** Bhattacharya has engaged in and is continuing to engage in conduct that constitutes a violation of numerous provisions in Azurity's policies and is otherwise unlawful.

**88.** Azurity has suffered and will continue to suffer irreparable harm and economic damages as a result of Bhattacharya's unlawful conduct. Moreover, Azurity has an urgent need to protect its legitimate business interests.

**89.** There is no adequate remedy at law that might address the irreparable injury caused by Bhattacharya's actions. Absent relief, there is no way to accurately forecast the effect on Azurity's business over time or the extent of the long-term damages due to Bhattacharya's actions.

**90.** Azurity is likely to prevail on the merits in this action. Should Azurity be required to wait until a full trial on the merits to enforce its legal rights, however, it will be irreparably harmed because it will continue to lose business, goodwill, and customers that it may never recover.

**91.** Injunctive relief is not contrary to the public health, safety, or welfare. Moreover, issuing injunctive relief will serve the public interest, and the harm to Azurity absent the requested relief strongly outweighs the risk of harm to Bhattacharya should injunctive relief be granted. The public interest is, in fact, served by an injunction, as it protects Azurity's confidential information.

**92.** Azurity has been required to retain the law firm of Ogletree Deakins to represent it in this action and has been obligated to pay the firm a reasonable fee for its services.

## CAUSES OF ACTION

### COUNT I - MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, ET SEQ.

**93.** Azurity realleges and incorporates by reference the factual allegations in paragraphs 12 through 90 above as if fully set forth herein.

**94.** The Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., creates a private civil cause of action for the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). A "trade secret" includes financial, business, and technical information that the owner has taken reasonable measures to keep secret and that derives independent economic value from not being generally known to, or readily ascertainable by, another person who can obtain economic value from its disclosure or use. 18 U.S.C. § 1839(3).

**95.** "Misappropriation" under the DTSA includes the acquisition of a trade secret by a person who knows or has reason to know the trade secret was acquired by improper means, or the disclosure or use of a trade secret without consent by a person who used improper means to acquire knowledge of the trade secret, or who, at the time of disclosure or use, knew or had reason to know the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy. 18 U.S.C. § 1839(5).

**96.** While employed by Azurity, Bhattacharya had access to Azurity's confidential and proprietary information and trade secrets, including its confidential

product and market-strategy data, business operations and strategic plans, as described above.

**97.** Azurity expended substantial time, effort, money, and resources in developing and maintaining this information.

**98.** Azurity takes reasonable, affirmative measures to maintain the confidentiality of this information for Azurity's exclusive benefit and competitive advantage, including the measures described above.

**99.** This information is Azurity's Trade Secrets.

**100.** The Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors such as Bhattacharya's new employer, Shorla.

**101.** The Trade Secrets constitute information subject to protection under the DTSA, 18 U.S.C. § 1839(3), and relate to services used in, or intended for use in, interstate commerce.

**102.** Bhattacharya knew she had a duty to maintain the secrecy of, and not disclose or misappropriate, Azurity's Trade Secrets, and to return any Trade Secrets in her possession upon separation.

**103.** Bhattacharya had actual knowledge that the information she obtained during her employment with Azurity, described above, constituted Azurity's Trade Secrets.

**104.** Bhattacharya misappropriated Azurity's Trade Secrets by acquiring, retaining, and—on information and belief—transmitting them without authorization and without any permitted purpose.

**105.** Bhattacharya misappropriated Azurity's Trade Secrets, or appropriated them without authorization, by taking, retaining, and not returning them after her employment with Azurity ended.

**106.** Bhattacharya misappropriated Azurity's Trade Secrets, or appropriated them without authorization, by—on information and belief—seeking to use and/or disclose them to Shorla in connection with her subsequent employment with Shorla.

**107.** Bhattacharya knew, or should have known, that she was prohibited from retaining and—on information and belief—disclosing or using Azurity's Trade Secrets after her employment with Azurity ended.

**108.** Bhattacharya's misappropriation was willful and malicious.

**109.** Unless Bhattacharya is permanently restrained and enjoined from using or disclosing the Trade Secrets, Azurity will suffer irreparable injury, as Bhattacharya will continue to have the ability to use or disclose Azurity's Trade Secrets for her own benefit or that of Shorla.

**110.** As a direct and proximate result of Bhattacharya's misappropriation of Azurity's Trade Secrets, Azurity has suffered, and will continue to suffer, irreparable harm and economic damages, including disruption of business, lost revenues and profits, and unjust enrichment not otherwise accounted for in computing actual loss.

**111.** Azurity has retained the law firm of Ogletree Deakins to represent it in this action and is entitled to recover its reasonable attorneys' fees and litigation costs to the full extent allowed under the DTSA.

**COUNT II - MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT, § 688.001, FLA. STAT., *et seq.***

**112.** Azurity realleges and incorporates by reference paragraphs 12 through 68 and 78 through 90 above as if fully set forth herein.

**113.** The Florida Uniform Trade Secrets Act, § 688.001, FLA. STAT. et seq., similarly defines a "trade secret" as information that derives independent economic value from not being generally known to, or readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and that is the subject of efforts reasonable under the circumstances to maintain its secrecy.

**114.** Under FUTSA, "misappropriation" includes acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means, and disclosure or use of a trade secret without express or implied consent by a person who used improper means to acquire knowledge of it or who knew or had reason to know that knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy.

**115.** While employed by Azurity, Bhattacharya had access to Azurity's Trade Secrets, including its confidential product and market strategy data, business operations, and strategic plans, as described above.

**116.** Azurity expended substantial time, effort, money, and resources in developing and maintaining the Trade Secrets.

**117.** Azurity takes reasonable, affirmative measures to maintain the confidentiality of the Trade Secrets for Azurity's exclusive benefit and competitive advantage, including the measures described above.

**118.** The Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, competitors such as Shorla.

**119.** The Trade Secrets constitute trade secrets subject to protection under the FUTSA.

**120.** Bhattacharya knew she had a duty to maintain the secrecy of, and not disclose or misappropriate, Azurity's Trade Secrets, and to return any Trade Secrets in her possession upon separation.

**121.** Bhattacharya had actual knowledge that the information she obtained during her employment with Azurity, described above, constituted Azurity's Trade Secrets.

**122.** Bhattacharya misappropriated Azurity's Trade Secrets, or appropriated them without authorization, by—on information and belief—seeking to disclose them to Shorla in connection with her subsequent employment with Shorla.

**123.** Bhattacharya knew, or should have known, that she was prohibited from retaining and—on information and belief—disclosing or using Azurity's Trade Secrets after her employment with Azurity ended.

**124.** Bhattacharya's misappropriation was willful and malicious.

**125.** Unless Bhattacharya is permanently restrained and enjoined from using or disclosing the Trade Secrets, Azurity will suffer irreparable injury, as Bhattacharya will continue to have the ability to use or disclose Azurity's Trade Secrets for her own benefit or that of Shorla.

**126.** Unless Bhattacharya is restrained and enjoined from using or disclosing the Trade Secrets, Azurity will suffer irreparable injury.

**127.** As a direct and proximate result of Bhattacharya's misappropriation of Azurity's Trade Secrets, Azurity has suffered, and will continue to suffer, irreparable harm and economic damages, including disruption of business, lost revenues and profits, and unjust enrichment.

**128.** Azurity has retained the law firm of Ogletree Deakins to represent it in this action and is entitled to recover its reasonable attorneys' fees and litigation costs to the full extent allowed under FUTSA.

## COUNT III – BREACH OF CONTRACT

**130.** Azurity realleges and incorporates by reference paragraphs 12 through 84 above as if fully set forth herein.

**131.** The contractual provisions contained in the Agreement are valid and enforceable contractual obligations between Bhattacharya and Azurity.

**132.** Azurity performed its obligations under the Agreement. It provided Bhattacharya with—and Bhattacharya received—valuable consideration for the restrictive covenants under Florida law in that Azurity employed and continued to employ her. It provided her with, and she received access to Azurity's confidential and proprietary information and trade secrets, clients, and prospects, as well as specialized training.

**133.** As described in more detail both above and below, Bhattacharya breached these contractual provisions. Bhattacharya's solicitation of her Azurity colleagues, Gitomer and Deacon; misappropriation, retention, and seemingly disclosure of its confidential and proprietary information and trade secrets constitute a direct breach of the Agreement.

**134.** Azurity further alleges, upon information and belief, that Bhattacharya intends to further breach those provisions in the future.

**135.** By breaching these valid and enforceable contractual provisions in the Agreement, Bhattacharya has caused damages to Azurity in an amount that is currently unknown and incalculable, but which will be calculated in discovery and before trial.

**136.** Azurity has suffered and will continue to suffer damages and irreparable harm as a result of Bhattacharya's actions.

## COUNT IV – TORTIOUS INTERFERENCE WITH PLAINTIFF'S ADVANTAGEOUS BUSINESS RELATIONSHIPS

**138.** Azurity realleges and incorporates by reference paragraphs 12 through 77 as if fully set forth herein.

**139.** Azurity has a reasonable expectancy of maintaining and entering into valid business relationships with its employees, such as Gitomer and Deacon, and its current customers and current vendors.

**140.** As a senior executive at Azurity, Bhattacharya knew these business relationships were critical to the Company's success.

**141.** Further, because of her role with Azurity, Bhattacharya had intimate knowledge of Azurity's business and operations, including its employee relationships and the confidential and proprietary information to which those employees had access.

**142.** Bhattacharya knowingly, intentionally, and unjustifiably interfered with these relationships to gain an unfair advantage in the marketplace by attempting to divert business from Azurity's customers and recruit or hire Azurity's employees, including—but not limited to—Gitomer and Deacon.

**143.** Bhattacharya's interference was without justification or privilege and was malicious.

**144.** Bhattacharya's actions are ongoing, including efforts to solicit other employees within Azurity's Market Access team.

**145.** As a result of Bhattacharya's tortious interference, Azurity has suffered and will continue to suffer irreparable harm and economic damages, including lost profits, lost business opportunities, and loss of goodwill and competitive advantage.

## COUNT V – AIDING AND ABETTING THE BREACH OF DUTY OF LOYALTY

**146.** Azurity realleges and incorporates by reference paragraphs 12 through 84, as if fully set forth herein.

**147.** Gitomer and Deacon owed fiduciary duties of loyalty to Azurity, including duties not to use their positions for their own personal benefit, or for the benefit of other companies such as Shorla, and/or to hinder Azurity's ability to succeed in its business operations.

**148.** Gitomer and Deacon were reposed with trust and confidence by Azurity, which they each knew and voluntarily accepted.

**149.** During their respective employment with Azurity, Gitomer and Deacon breached their duty of loyalty to Azurity by misappropriating Azurity's confidential information and trade secrets prior to leaving to work for Shorla.

**150.** Through this conduct, Gitomer and Deacon engaged in disloyal acts in anticipation of their future employment with Shorla, breaching their respective duties of loyalty.

**151.** Bhattacharya aided and abetted the breach of duties of loyalty owed to Azurity.

**152.** Bhattacharya had knowledge of the duties of loyalty owed to Azurity based on Bhattacharya's prior employment with Azurity and Bhattacharya's role as a

senior executive for Shorla, specifically including the confidential and/or proprietary information to which Azurity employees had access.

**153.** Bhattacharya substantially assisted and encouraged breaches of the duty of loyalty by facilitating or soliciting Gitomer's and Deacon's disloyal conduct and by recruiting or encouraging them to join her team at Shorla.

**154.** As a direct and proximate result of Bhattacharya's aiding and abetting the breaches of the duties of loyalty, Azurity has suffered damages.

## REQUEST FOR RELIEF

Azurity respectfully requests that this Court enter judgment for Azurity and against Bhattacharya as follows:

**A.** Temporarily, preliminarily, and permanently enjoining Bhattacharya from using, disclosing, retaining, or further transmitting any of Azurity's confidential and proprietary information and trade secrets that Bhattacharya transmitted via her personal email account, and awarding Azurity all damages it may recover under applicable law suffered as the direct and proximate result of Bhattacharya's breach of the DTSA and FUTSA;

**B.** Ordering Bhattacharya to immediately return to Azurity any of its electronic and hardcopy confidential and proprietary information and trade secrets and to take all steps necessary to effectuate a forensic examination of any devices capable of performing computing functions or storing electronic information that are owned by, have been used by, or have been accessible to Bhattacharya at any time since six months before her employment with Azurity terminated for the purpose of

determining how she has accessed, used, disclosed, or misappropriated Azurity's confidential and proprietary information and trade secrets;

**C.** Granting Azurity access to any personal and business accounts used for communication purposes by Bhattacharya so that Azurity may determine the extent to which Bhattacharya took actions toward misappropriating the Trade Secrets;

**D.** Granting Azurity access to any electronic devices owned, used or accessed by Bhattacharya for the purpose of determining if such devices contain copies of Azurity's confidential and proprietary information and trade secrets, and permitting Azurity to take any other appropriate and reasonable steps to recover its confidential and proprietary information and trade secrets and to ensure none of Azurity's confidential and proprietary information and trade secrets was distributed or preserved by Bhattacharya in any form;

**E.** Enjoining Bhattacharya from in any way divulging, disseminating, or utilizing Azurity's confidential and proprietary information and trade secrets in the interim and permanently (including—but not limited to—following a thorough forensic examination requiring Bhattacharya to permanently delete or destroy all copies of such confidential and proprietary information and trade secrets in her possession, custody, or control, in whatever form and on whatever device or account such information resides, and to certify such deletion and destruction in writing under oath);

**F.** Temporarily, preliminarily, and permanently enjoining Bhattacharya from continuing to violate any of her obligations under her Agreement including, but

not limited to, enjoining her from soliciting Azurity's employees in violation of the "Worker Nonsolicit" covenant and awarding Azurity all damages that it may recover under applicable law suffered as the direct and proximate result of Bhattacharya's breaches;

**G.** Entering judgment against Bhattacharya, and awarding Azurity all damages available under applicable law together with prejudgment and post-judgment interest, costs, attorneys' fees, and such other and further relief, at law or in equity, as the Court deems just.

DATED: August 17, 2026.

Respectfully submitted,

***/s/ John C. Getty***
**John C. Getty**; FBN: 1013911
john.getty@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
100 North Tampa Street, Suite 3600
Tampa, Florida 33602
Telephone: 813-289-1247
Facsimile: 813-289-6530

*Attorneys for Plaintiff, AZURITY PHARMACEUTICALS, INC.*