**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AZURITY PHARMACEUTICALS, INC.,

Plaintiff,

v. Case No. 8:26-cv-02391

SHEILA BHATTACHARYA, et al.,

Defendants.

________________________________________/

**SHEILA BHATTACHARYA'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant Sheila Bhattacharya ("Bhattacharya") hereby submits this response in opposition to the Motion for Preliminary Injunction (the "Motion," Dkt. 23) filed by Plaintiff Azurity Pharmaceuticals, Inc. ("Azurity").

## INTRODUCTION

A preliminary injunction is "an extraordinary and drastic remedy" that may not issue unless the movant clearly carries its burden on each of four prerequisites. *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 464–65 (M.D. Fla. 2022) (quoting *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983)). Azurity cannot satisfy any of them.

The Motion seeks an order (1) prohibiting Bhattacharya and Shorla from using or disclosing Azurity's trade secrets and confidential information, and (2) enjoining Bhattacharya from continuing to violate her Agreement. (Dkt. 23 at 23.)



36359434-4

That relief rests on a contract Bhattacharya never signed. Even if she had, it was superseded by a later integrated agreement signed after her termination which Azurity failed to provide to the Court. Further, Azurity identifies no trade secret with particularity and provides no evidence of misappropriation. Azurity's asserted harm is speculative, and belied by Azurity's own delay. The Motion should be denied.

## STATEMENT OF FACTS

### A. The Alleged Confidentiality, Non-Solicitation and Intellectual Property Assignment Agreement

Azurity alleges that Bhattacharya signed the Confidentiality, Non-Solicitation and Intellectual Property Assignment Agreement (the "Non-Solicitation Agreement") on September 2, 2023—more than a year after she began her employment, despite Azurity's contention that her "employment was contingent on executing the Agreement." (Dkt. 6 ¶ 31; Dkt. 23 at 4, 16.) Bhattacharya did not sign it. (Bhattacharya Decl. ¶ 3.)[1]

The Non-Solicitation Agreement bears no signatures. (Dkt. 23-1 at 11.) Azurity instead attaches a purported "electronic signature" that does not mention the Non-Solicitation Agreement, but acknowledges completion of a different document—the "Confidentiality Policy," which is neither attached to nor

[1] The Declaration of Sheila Bhattacharya is attached as Exhibit A and cited as "Bhattacharya Decl."

referenced in the Amended Complaint. (*See id.* at 16.) Its "Description" does not mention non-solicitation; it states only: "This Policy[2] outlines the guidelines and expectations for handling confidential and proprietary information belonging to our company." (*Id.*)

Regardless, all agreements related to Bhattacharya's employment were superseded by her termination agreement dated September 2, 2025 (the "Termination Agreement"), which provides that it "and the Non-Disclosure and Proprietary Rights Agreement constitute the entire agreement between [Bhattacharya] and [Azurity] and supersedes all other agreements . . . with respect to [Bhattacharya's] employment, its termination and all related matters." (Ex. B ¶ 12.)

**B. Bhattacharya's Employment with Azurity**

Bhattacharya's July 22, 2022, offer letter (the "Offer Letter") does not require a non-solicitation agreement; it conditions employment on "the Azurity confidentiality and non-disclosure agreement" and "the Proprietary Information and Inventions Agreement." (Ex. C at 2.)

Bhattacharya worked remotely from her home office in Tampa, Florida, but also traveled to various Azurity offices. (Bhattacharya Decl. ¶ 5; *see* Ex. C.) She was

---

[2] It is noteworthy that an employer "policy" is not a binding employment agreement. *See Carlucci v. Demings*, 31 So. 3d 245, 247 (Fla. 5th DCA 2010).

assigned only to the Market Access and Strategic Accounts ("Market Access") department within Azurity's Commercial Organization, which also included Sales, Marketing, Commercial Operations, and Legacy Brands and Generics departments. (Bhattacharya Decl. ¶ 6.) In early 2025, Legacy Brands and Generics became the separate Established Brands Organization. (*Id.* ¶ 7.) Xatmep was the responsibility of Established Brands. (*Id.*) Bhattacharya never worked for any department that promoted Xatmep. (*Id.*)

Beginning August 22, 2022, Bhattacharya served as Vice President of Market Access and Strategic Accounts, managing 21 people. (*Id.* ¶ 4.) Market Access ensured that high value products within its purview would be covered by insurers and reimbursed by payers. (*Id.* ¶ 9.) Her duties included managing department operations and budget, overseeing payer strategies, and educating internally on legislative impacts to high-value products. (*Id.* ¶ 10.) Her work never personally related to Xatmep. (*Id.* ¶ 8.)

Azurity terminated Bhattacharya without notice on September 2, 2025, during a call with Chief Commercial Officer Chad Collins and Senior Director of HR Jennifer Ferraris, who told her that her server and email access were being cut off immediately. (*Id.* ¶ 11; Ex. B at 1.) She was permitted to send one email to cancel a speaking engagement, and she returned her laptops, badge, and credit card as soon as Azurity provided a shipping box. (Bhattacharya Decl. ¶ 12.) Because she

had no advance knowledge of her termination, she had no opportunity to take any documents for any competitor. (*Id.* ¶ 14.) Contrary to the Motion's claim that she "exfiltrated" documents (Dkt. 23 at 11), the only Azurity documents that she ever used was to perform her job at Azurity. (Bhattacharya Decl. ¶ 15.) During the call, she was asked to sign the Termination Agreement, which she executed on September 12, 2025. (*Id.* ¶ 13; Ex. B at 5.)

**C. Unemployment and Subsequent Employment at Shorla**

Bhattacharya was unemployed for more than 200 days. (Bhattacharya Decl. ¶ 18.) In April 2026, she joined Shorla Oncology, Inc. ("Shorla") as Vice President of Strategy and was promoted to Chief Commercial Officer in June 2026, responsible for Shorla's commercial budget and product revenue. (*Id.* ¶ 19.)

**D. The Alleged Trade Secrets**

The Motion references two unattached documents: a commercial due diligence presentation and an Oncology Monthly Franchise Alignment Review Meeting presentation. (Dkt. 23 at 5, 11; Dkt. 6 ¶¶ 65–66.) Azurity describes the documents only in general categories and provides no detail showing that either is confidential or a trade secret. (Dkt. 23 at 11.) Azurity has failed to provide either of them to the Court so that the Court can examine the contents to evaluate whether either contain alleged trade secrets.

Bhattacharya emailed herself the Oncology Monthly presentation only to print it in order to take notes on it during the meeting, because her Azurity computers connected only to Azurity office printers and Azurity provided no home printer. (Bhattacharya Decl. ¶ 16.) Bhattacharya has not used, disclosed, or otherwise referred to this document since her termination. (*Id.*) Azurity has produced no evidence to the contrary to establish its claim of misappropriation.

Without evidence, Azurity also attempts to attribute the conduct of Michael Gitomer ("Gitomer") and Kimberly Deacon ("Deacon") to Bhattacharya, who left Azurity many months after Bhattacharya's termination. Based only on "timing and circumstances" Azurity alleges that she "coordinat[ed] the misappropriation." (Dkt. 6 ¶ 76; Dkt. 23 at 5.) She never directed them to retain any documents from Azurity and was unaware they may have until these actions were filed. (Bhattacharya Decl. ¶ 20.)

**F. The Alleged Collusion**

Azurity alleges "collusion with Deacon" because Bhattacharya observed the emergency TRO hearing against Deacon by Zoom.[3] (Dkt. 23 at 6.) Azurity initiated related lawsuits against Bhattacharya, Gitomer, and Deacon (Dkt. 6 ¶ 9).

[3] Although Azurity alleges that they have attached a transcript of this hearing and cite to the transcript throughout its Injunction Motion, it has attached the wrong transcript.

Bhattacharya's interest in understanding and observing a hearing in one of those cases does not support an inference of "collusion."

## LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy" that is "the exception rather than the rule." *Blue-Grace*, 340 F.R.D. at 464–65 (citation and internal marks omitted). The movant must clearly establish "(1) a substantial likelihood of success on the merits; (2) that [it] will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, that the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Failure to prove all elements requires denial of the Motion.

## ARGUMENT

### I. Azurity Has No Substantial Likelihood of Success on the Merits.

### A. Azurity cannot succeed on its breach-of-contract claim.

Azurity's contract theory rests entirely on the Non-Solicitation Agreement's confidentiality provisions (Sections 3.1 and 6) and twelve-month "Worker Nonsolicit" covenant (Section 4.3). (Dkt. 23 at 18.) Each of the following defects is independently fatal.

**1. Bhattacharya never signed the Non-Solicitation Agreement.**

Florida bars enforcement of any restrictive covenant not "set forth in a writing signed by the person against whom enforcement is sought." Fla. Stat. § 542.335(1)(a). The Non-Solicitation Agreement's signature block is blank. (Dkt. 23-1 at 11.) The only "signature" Azurity offers is a learning-platform transcript entry acknowledging electronic completion of a "Confidentiality Policy," whose description refers only to "guidelines and expectations for handling confidential and proprietary information." (*Id.* at 16.) Nothing in that electronic entry identifies the Non-Solicitation Agreement or any non-solicitation obligation. (*See id.*) A covenant Bhattacharya never signed cannot support an injunction.

**2. The Termination Agreement superseded the Non-Solicitation Agreement.**

Even if signed, the Non-Solicitation Agreement was extinguished by the Termination Agreement, which "supersedes all other agreements, whether written or oral, with respect to [Bhattacharya's] employment, its termination and all related matters," preserving only "the Non-Disclosure and Proprietary Rights Agreement." (Ex. B ¶ 12.) By omitting the Non-Solicitation Agreement from that carve-out, the parties confirmed it was superseded.[4] At a minimum, the

[4] The Termination Agreement is governed by Massachusetts law (Ex. B ¶ 12), which confirms this principle. *See MacDonald v. Jenzabar, Inc.*, 92 Mass. App. Ct. 630, 636–37 (2018) (enforcing a severance agreement whose merger clause "terminated and superseded all other oral and written agreements or arrangements" except a single, expressly preserved confidentiality agreement—and held that, by expressly excepting that one agreement, the

integration clause makes it impossible for Azurity to "clearly establish" that the Non-Solicitation Agreement remains enforceable.

**3. Azurity has shown no legitimate business interest.**

The Non-Solicitation Agreement, improperly relied upon by Azurity, restricts solicitation and disclosure only "for the benefit of a Competitor" (Dkt. 23-1 §§ 3.1, 4.3), defined as a business that competes with "the products and/or services provided by any part of the Company's business that [the employee] **had material involvement with** in the Look Back Period." (*Id.* § 4.1 (emphasis added).) Bhattacharya had no involvement with Xatmep, the only product Azurity alleges competes with a Shorla product. (Bhattacharya Decl. ¶¶ 7–8; Dkt. 23 at 4–5.) Therefore, Azurity cannot establish a legitimate business interest justifying the restraint, as Florida requires. Generalized assertions of competition and confidential information do not suffice. Fla. Stat. § 542.335(1)(b)–(c); *See Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) ("[A] party seeking enforcement of a restrictive covenant cannot rely on customer relationships as a legitimate interest unless the party pleads and proves the identity of *specific* customers and the substantiality of the relationship with those customers." (citation and internal marks omitted)).

---

parties "revealed, by way of omission, that they did not intend to create an exception" for other prior rights, which were therefore extinguished).

**B. Azurity cannot succeed on its trade-secret claims.**

The DTSA and FUTSA claims rise and fall together. *Bote, LLC v. IRocker Inc.*, No. 3:25-cv-376-MMH-MCR, 2026 WL 709762, at *10 (M.D. Fla. Mar. 13, 2026). Azurity must show "(1) it possessed a trade secret and (2) the secret was misappropriated." *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017). It can show neither.

**1. Azurity has not identified an alleged trade secret.**

Azurity bears "the burden to show how the information qualifies as a trade secret." *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV, 2017 WL 532299, at *3 (S.D. Fla. Feb. 9, 2017) (citation omitted). A trade secret must derive independent economic value from not being generally known and be the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4). Azurity references two unattached documents described only in broad, conclusory categories. (Dkt. 23 at 11; Dkt. 6 ¶¶ 65–66.) Without the documents, the Court cannot assess whether they are any alleged trade secrets.

**2. Azurity has not shown misappropriation.**

Azurity's Motion relies on "information and belief," but provides no evidence of misappropriation. Misappropriation requires acquisition by improper means, or unauthorized use or disclosure. 18 U.S.C. § 1839(5); Fla. Stat. § 688.002(2). Azurity does not contend that Bhattacharya accessed anything she was

not authorized to access; it contends only that she emailed work documents to herself while employed. (Dkt. 23 at 5, 13.) That is not "improper means." *See* 18 U.S.C. § 1839(6). And "[m]erely possessing trade secrets and holding a comparable position with a competitor does not justify an injunction." *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001) (citation omitted). A plaintiff "will not succeed on a claim for trade secret misappropriation by establishing only that a defendant possessing the trade secret left the plaintiff's employ to work for a competitor, even in a highly similar role." *Bote*, 2026 WL 709762, at *10. Bare allegations that a defendant "used and/or disclosed" or "misappropriated" trade secrets are conclusory and must be disregarded. *Id.* at *11. Facts showing only that a former employee joined a competitor more than 200 days later "do no more than suggest the possibility of trade secret misappropriation," which is insufficient. *Id.*

That is all Azurity has. It is true that Bhattacharya has emailed documents to herself while she was employed by Azurity, for example, to print them, but has not used or disclosed them, or any Azurity confidential or trade secret documents, since her termination. (Bhattacharya Decl. ¶¶ 16–17.) Having been terminated without notice and immediately cut off from Azurity's systems, she had no opportunity to take anything for a competitor's use. (*Id.* ¶ 14.) Notably, Azurity

pleads use and disclosure only "on information and belief." (Dkt. 6 ¶¶ 73, 114, 116.)

Furthermore, Azurity intentionally obscures the truth behind Bhattacharya's separation from it in order to paint a false picture that she emailed Azurity documents to herself immediately before resigning. Azurity asserts that "[b]efore her departure, Bhattacharya emailed Azurity confidential and proprietary information and trade secrets to her personal email address." (Dkt. 23, 1.) However, the truth is that Bhattacharya had no knowledge that her employment with Azurity was coming to an end. While an Azurity employee carrying out her duties for Azurity, she emailed documents to herself in the normal course. Then, on September 2, 2025, Bhattacharya was abruptly terminated without prior notice during a telephone call with her superiors. During that call her access to Azurity email was terminated. Azurity cannot credibly claim that Bhattacharya had any intent to email Azurity documents to herself for the intended benefit of a competitor she became employed by more than 200 days later.

**II. Azurity Cannot Show Irreparable Harm.**

Irreparable injury is the "'sine qua non of injunctive relief,'" and the absence of "'a substantial likelihood of irreparable injury would, standing alone, make

preliminary injunctive relief improper.'"[5] *Blue-Grace*, 340 F.R.D. at 465 (quoting *Siegel*, 234 F.3d at 1176). The harm must be "neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.* v. *City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation omitted). Azurity has not met its burden.

**1. Azurity's asserted harm is speculative.**

Azurity asserts that once trade secrets are "taken by a rival . . . the bell cannot be unrung." (Dkt. 23 at 20.) But it offers no evidence that Bhattacharya has used or disclosed anything at Shorla. A former employee's "mere presence" at a competitor "does not rise to the level of irreparable injury," and unrebutted testimony that the employee has not used the information means "it can hardly be the basis of irreparable harm." *Blue-Grace*, 340 F.R.D. at 465, 470 ("[Plaintiff] points to no evidence to counter [Defendant's] affidavit that he has not disclosed, used, or reviewed these documents since he left [Plaintiff] except to respond to [Plaintiff's] discovery requests . . . . Left unrebutted that [Defendant] has not used that information, . . . it can hardly be the basis of irreparable harm.").

[5] Although the Non-Solicitation Agreement provides that a breach would cause irreparable harm (Dkt. 23-1 § 8); such a contractual label cannot relieve a movant of its evidentiary burden under Rule 65 (and, in any event, the agreement was never signed). *B&G Equip. Co. v. Airofog USA, LLC*, 2019 WL 2537792 (M.D. Fla. June 20, 2019) (holding that such a provision "is not dispositive of the issue of irreparable harm, does not in and of itself create a presumption of irreparable harm, nor is it binding upon the Court," and that courts accord these clauses "little to no weight"); *Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1261 (S.D. Fla. 2025) ("[T]his private agreement does not bind the Court's analysis as to whether Plaintiffs have satisfied their burden of showing irreparable harm, and . . . standing alone, is insufficient.").

**2. The harm Azurity attributes to Gitomer and Deacon cannot support an injunction against Bhattacharya—and is already restrained.**

Much of Azurity's harm narrative rests on alleged misappropriation by Gitomer and Deacon, not Bhattacharya. (*See* Dkt. 23 at 20.) Azurity has already pursued that conduct in parallel actions in the Western and Eastern Districts of Pennsylvania (*id*. at 6), where the courts have entered orders prohibiting Gitomer, Deacon, and Shorla from retaining, disclosing, or using Azurity's confidential and trade-secret information. Because Shorla is already so prohibited, the feared use of that information at Shorla—including through Bhattacharya, its officer—is already restrained. Where the feared conduct is already addressed by existing injunctive relief, a further injunction is "unnecessary" and "no additional injunction is required." *Blanco GmbH + Co. KG v. Vlanco Indus., LLC*, 992 F. Supp. 2d 1225, 1234 (S.D. Fla. 2014). An injunction will not issue to duplicate protection the movant has already secured through other relief. "[I]f a less drastic remedy . . . was sufficient to redress [the movant's] injury, no recourse to the additional and extraordinary relief of an injunction [i]s warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

**3. Azurity's delay confirms the absence of urgency.**

Delay "of even only a few months . . . militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). The only conduct attributed to Bhattacharya occurred before her September

2, 2025 termination, and the emails sat on Azurity's own systems the entire time. (Dkt. 6 ¶¶ 60, 64; Dkt. 23 at 5.) Yet Azurity waited more than thirteen months, until October 23, 2026, to seek relief. (Dkt. 23 at 23.) Information in a party's own email system is not "recently learned." (*Cf. id.* at 5.) And even measured from August 7, 2026—when Azurity sent a cease-and-desist letter citing these emails—or August 26, 2026, when it filed its verified Amended Complaint, Azurity waited more than two months and never sought a TRO against her. (Dkt. 6 ¶¶ 84–87; Dkt. 6 at 1.) A movant facing imminent harm "would not have delayed as it has done." *Blue-Grace*, 340 F.R.D. at 470. Its "failure to act with speed or urgency . . . necessarily undermines a finding of irreparable harm." *Wreal*, 840 F.3d at 1248.

**III. The Balance of the Equities Favors Bhattacharya.**

Azurity's requested order would operate as a de facto non-compete. Bhattacharya is Shorla's Chief Commercial Officer. (Bhattacharya Decl. ¶ 19.) An order restraining her use of undefined "confidential information" and directing her not to "violate" the Agreement would hang over her everyday duties on pain of contempt, though she remains free to use "contacts and expertise gained during [her] former employment." *Templeton v. Creative Loafing Tampa, Inc.*, 552 So. 2d 288, 289–90 (Fla. 2d DCA 1989); *see* Dkt. 23-1 § 3.1. Trade-secret law may not be used "as an after-the-fact noncompete agreement." *Del Monte*, 148 F. Supp. 2d at 1337; *see Vital Pharms.*, 23 F.4th at 1291–93 (vacating open-ended confidentiality

injunction barring a former executive from "using . . . any of [the employer's] [c]onfidential and [p]roprietary information," where harm was speculative). And where covenants are not shown valid, "the balance of harm tips in favor of" the former employee. *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1338 (M.D. Fla. 2010).

The request is also impermissibly vague. Rule 65(d)(1) requires an injunction to describe the restrained acts "in reasonable detail—and not by referring to the complaint or other document." Fed. R. Civ. P. 65(d)(1)(C). A court "may not simply order [a party] to 'obey the law,'" and the Eleventh Circuit has held an injunction barring use of the plaintiff's "lists or any other documents that contain trade secrets" impermissibly vague for failing to identify the information it covered. *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1411–12 (11th Cir. 1998). An order directing Bhattacharya to comply with, or not violate, the Agreement would impermissibly define the prohibited conduct by "referring to the complaint or other document"—exactly what Rule 65(d)(1)(C) forbids—and would leave her to gauge her conduct against the contested meaning of the very contract at the center of this dispute, on pain of contempt. That risk falls entirely on Bhattacharya.

Against all of this, Azurity's asserted harm is lost business and goodwill—injury it concedes is measured in damages, that the trade-secret statutes already

protect against actual misappropriation, and that is further addressed by the relief Azurity has obtained against Gitomer and Shorla in Pennsylvania. (Dkt. 6 ¶¶ 98, 122; *Gitomer* Order ¶ 1.) And to the extent Azurity presses the forensic examination of Bhattacharya's personal devices and accounts described in its introduction, that intrusion only deepens the hardship side of the balance. The balance of the equities tips decidedly against the extraordinary relief Azurity seeks.

**IV. An Injunction Would Disserve the Public Interest.**

Azurity's public-interest argument presumes "the clear violation of a valid contract." (Dkt. 23 at 21.) Without a signed, operative, unexpired covenant, it collapses. The public interest favors employee mobility and preserves "a person's inalienable right to work." *Semper Foods, LLC v. Ouellette*, No. 23-cv-81420, 2024 WL 3104066, at *10 (S.D. Fla. May 6, 2024); *see Del Monte*, 148 F. Supp. 2d at 1336–37.

**V. The Forensic Examination and Related Measures Described in the Motion's Introduction Are Unwarranted.**

The Motion's introduction—but not its conclusion—mentions "a forensic examination of Bhattacharya's personal devices and accounts" and "certification under oath," without supporting argument or a proposed protocol. (Dkt. 23 at 2.) Such mandatory relief is "inappropriate"; any retained information should instead "be made available during discovery." *Nat'l Staffing Sols., Inc. v. Armstrong*, No. 6:23-cv-1693-WWB-EJK, 2024 WL 1657193, at *6 n.1 (M.D. Fla. Jan. 25, 2024)

(holding that an injunction compelling a former employee to allow the plaintiff to access his devices was inappropriate). Forensic examination of personal devices "is the exception, not the rule," requiring "clear evidence" of a discovery default or tampering and a protocol protecting privacy. *Partners Insight, LLC v. Gill*, No. 2:22-cv-739-SPC-KCD, 2023 WL 2864375, at *2 (M.D. Fla. Apr. 10, 2023). Azurity shows none of these. *See Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1356–58 (N.D. Ga. 2017) (denying device-imaging relief where the movant supported its request with only "speculative allegations").

## CONCLUSION

Azurity has not carried, and cannot carry, its burden on any of the four preliminary-injunction factors—and its failure on any one is fatal. *Blue-Grace*, 340 F.R.D. at 464–65. For the foregoing reasons, Bhattacharya respectfully requests that the Court deny Azurity's Motion for Preliminary Injunction.

Dated: November 13, 2026.

**BERGER SINGERMAN, LLP**
2309 S. MacDill Avenue
Tampa, Florida 33629
(813) 498-3400

By: */s/ Raul Valles*
Robert L. Rocke
Florida Bar No. 710342
Email: rrocke@bergersingerman.com
Raul Valles, Jr.
Florida Bar No. 148105
Email: rvalles@bergersingerman.com

Secondary: lknox@bergersingerman.com
E-Service: DRT@bergersingerman.com
E-Service: DRT@ecf.inforuptcy.com
*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on November 13, 2026, a true and correct copy of the foregoing was served via CM/ECF to all parties who receive electronic noticing.

*/s/ Raul Valles*
Raul Valles, Jr., Esquire

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AZURITY PHARMACEUTICALS, INC.,
Plaintiff,

v. Case No. 8:26-cv-02391

SHEILA BHATTACHARYA, et al.,
Defendants.
_______________________________________/

**DECLARATION OF SHEILA BHATTACHARYA**
**IN SUPPORT OF HER RESPONSE IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Sheila Bhattacharya, declare as follows:

1. My name is Sheila Bhattacharya. I am over eighteen years of age, am competent to make this declaration, and have personal knowledge of the facts stated herein.

2. I am a Defendant in this action. I submit this declaration in support of my Response in Opposition to Plaintiff Azurity Pharmaceuticals, Inc.'s ("Azurity") Motion for Preliminary Injunction (the "Motion") (Dkt. 23).

3. I did not sign the Confidentiality, Non-Solicitation and Intellectual Property Assignment Agreement (the "Non-Solicitation Agreement") that Azurity attached to its Motion (Dkt. 23-1).

4. Beginning August 22, 2022, I served as Vice President of Market Access and Strategic Accounts at Azurity, managing 21 people.

5. I worked remotely from my home office in Tampa, Florida, but also traveled to various Azurity offices.

6. I was assigned to the Market Access and Strategic Accounts ("Market Access") department within Azurity's Commercial Organization, which also included Sales, Marketing, Commercial Operations, and Legacy Brands and Generics departments.

7. In early 2025, Legacy Brands and Generics became the separate Established Brands Organization. Xatmep was the responsibility of Established Brands. I never worked for any department that promoted Xatmep.

8. My work never personally related to Xatmep. I never promoted Xatmep.

9. Market Access ensured that high-value products within its purview would be covered by insurers and reimbursed by payers.

10. My duties included managing department operations and budget, overseeing payer strategies, and educating internally on legislative impacts to high-value products.

11. Azurity terminated me without notice on September 2, 2025, during a call with Chief Commercial Officer Chad Collins and Senior Director of HR

Jennifer Ferraris, who told me that my server and email access were being cut off immediately.

12. I was permitted to send one email to cancel a speaking engagement, and I returned my laptops, badge, and credit card as soon as Azurity provided a shipping box.

13. During the September 2, 2025 call, I was asked to sign a separation agreement with Azurity (the "Termination Agreement"), which I executed on September 12, 2025.

14. I had no advance knowledge of my termination. Because I was terminated without notice and immediately cut off from Azurity's systems, I had no opportunity to take any documents for any competitor.

15. The only Azurity documents I ever used, I used to perform my job at Azurity.

16. While employed by Azurity and carrying out my duties, I occasionally emailed documents to myself in the normal course of business, for example, to print them. I emailed myself the Oncology Monthly Franchise Alignment Review Meeting presentation only to print it so that I could take notes on it during the meeting, because my Azurity computers connected only to Azurity office printers and Azurity did not provide me with a home printer. I have

not used, disclosed, or otherwise referred to the Oncology Monthly Franchise Alignment Review Meeting presentation since my termination.

17. I have not used or disclosed any Azurity confidential or trade secret documents since my termination.

18. Following my termination, I was unemployed for more than 200 days.

19. In April 2026, I joined Shorla Oncology, Inc. ("Shorla") as Vice President of Strategy. I was promoted to Chief Commercial Officer in June 2026, and I am responsible for Shorla's commercial budget and product revenue.

20. I never directed Michael Gitomer or Kimberly Deacon to retain any documents from Azurity, and I was unaware that they may have done so until these actions were filed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on November 13th, 2026, in Tampa, Florida.

Signed by:
Sheila Bhattacharya
9276E1B454D6441...

Sheila Bhattacharya

# EXHIBIT B

azurity pharmaceuticals

September 2, 2025

Sheila Bhattacharya
[redacted]

Dear Sheila:

As we discussed, Azurity Pharmaceuticals, Inc. (the "Company") has made the difficult decision to terminate your employment effective end of business day on September 2, 2025 (the "Separation Date"). In connection with the termination of your employment, the Company is offering certain benefits to which you are not otherwise entitled, in exchange for certain obligations on your part. This letter is referred to as the "Agreement."

1. Earned Compensation, Business Expenses. On the next regularly scheduled pay date after Separation Date, you will receive your final pay for all accrued but unpaid wages earned through and including the Separation Date. All payments are subject to applicable withholdings and deductions. You will also be reimbursed for any authorized business expenses that you may have incurred prior to the Separation Date, provided that you have submitted an expense report and supporting documentation in accordance with the Company's policies and practices no later than one (1) month after the Separation Date. You will receive the earned compensation and reimbursement of business expenses described in Paragraph 1 even if you do not sign this Agreement.

2. Continuation of Health, Dental & Vision Insurance. Your regular coverage under the Company's healthcare plans, if you currently participate, will end on **September 30, 2025**. If you currently participate in the Company's group healthcare plan(s), you have the option of extending that coverage, at your own cost, by electing continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). COBRA coverage is generally available for eighteen (18) months from the Separation Date. Instead of electing COBRA continuation coverage, you have the option of selecting different healthcare insurance coverage through the Health Insurance Marketplace under the Affordable Care Act. The Health Insurance Marketplace will offer you a wide range of plan choices at different prices. You will be provided with appropriate notification and election forms shortly after the Separation Date. Unless otherwise permitted in the plan documents, you will no longer be eligible for any other benefit plans after the Separation Date, except for your vested rights in the Company's 401(k) plan. You will receive the COBRA letter and the option to select different healthcare insurance coverage described in this Paragraph 2 even if you do not sign this Agreement.

3. Severance Benefits. If, and only if, you:

A. Sign this Agreement **no later than September 23, 2025;**

B. Do not revoke your acceptance of this Agreement within the Revocation Period, as defined in Paragraph 5, below; and

C. Comply with all of the terms of this Agreement;

the Company will provide you with the following benefits ("Severance Benefits"):

i. **Severance pay in an amount equal to twenty-six (26) weeks** of pay and one additional week for each full year of service (3), at the base salary rate, that you were being paid on the Separation Date (**29 total weeks and total payment of $197,535.25**), subject to all applicable withholdings and deductions, payable in a lump sum on the Second Effective Date;

ii. You are eligible to receive your prorated **annual bonus** for the year 2025 at 100% of target (minus applicable withholdings and deductions) paid on the next regularly scheduled payroll date after the Second Effective Date; and

iii. **Coverage for up to eight (8) consecutive months COBRA premiums by Company at your current coverage level starting the month after your Separation Date**, provided that you are eligible for and timely elect COBRA coverage, you maintain coverage at the employee's share of premiums, and provided that you are not eligible for group health insurance coverage through another employer, entity or any governmental program.

4. General Release, Waiver and Covenant Not to Sue. Except as specifically set forth in this Agreement, and in consideration and exchange for the Severance Benefits set forth above, and for other good and valuable consideration described herein, you, Sheila Bhattacharya, on behalf of yourself, your heirs, next of kin, executors, administrators, agents, representatives, attorneys and assigns, knowingly and voluntarily forever release and discharge Azurity Pharmaceuticals, Inc. and its past, present and future affiliates, subsidiaries, parent companies, predecessors, successors, assigns, shareholders, partners, members, owners, trustees, officers, directors, employees, attorneys, fiduciaries, insurers, representatives and agents, both individually and in their business capacities (collectively, the "Releasees"), of and from, and waive any rights in and to, all claims, complaints, demands, contracts, grants, lawsuits, causes of action or expenses of any kind (including attorney's fees and costs), (collectively, "Claims"), whether known or unknown, that you now have or ever had against the Releasees or any of them up to your signing this Agreement, including but not limited to Claims related to or arising from your employment with the Company and/or the termination thereof; Claims arising under common law; Claims for breach of contract and in tort; Claims for unpaid compensation, unpaid bonuses, equity or any employee benefits; Claims for attorney's fees and costs; and Claims arising under federal, state or local labor law, employment laws and laws prohibiting employment discrimination (based on gender, race, religion, national origin, age, sexual orientation, disability, veteran status and other protected classes), including but not limited to: Title VII of the Civil Rights Act, the Equal Pay Act, the Fair Labor Standards Act, the Consolidated Omnibus Budget Reconciliation Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act, the Age Discrimination in Employment Act, the Older Workers' Benefit Protection Act, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, and all related regulations, rules or orders, and similar federal, state or local statutes, regulations, rules or ordinances, including but not limited to the Massachusetts Fair Employment Practices Act, Massachusetts Civil Rights Act, Massachusetts Equal Rights Law, Massachusetts Weekly Payment of Wages Act, Massachusetts Earned Sick Time Law, Massachusetts Paid Family Leave Act, the North Carolina Equal Employment Practices Act (EEPA), Persons with Disabilities Protection Act (PDPA), and Retaliatory Employment Discrimination Act (REDA), N.C. Gen. Stat. §§ 143-422.2, 168A-3 through 168A-5, and the Florida Civil Rights Act, each as amended. You further covenant not to sue the Releasees, or any of them, for any Claims described above. For avoidance of doubt, this means that you have released the Releasees from liability from any Claims, and, additionally, separately agree not to commence any legal action for any Claims described above. You understand that the release contained herein is a GENERAL RELEASE and acknowledge that the Severance Benefits and other benefits in this Agreement are sufficient consideration for your obligations and release in this Agreement.

You acknowledge that with your final paycheck, you have been paid any and all wages (including all base compensation and, if applicable, any and all overtime, commissions which are due and payable as of the Separation Date) to which you are or were entitled by virtue of your employment with the Company, and that you are unaware of any facts or circumstances indicating that you may have an outstanding claim for unpaid wages, improper deductions from pay, or any violation of the Fair Labor Standards Act, or any other federal, state or local laws, regulations, rules, ordinances or orders that are related to payment of wages.

You acknowledge that you have not suffered an injury in the workplace which has not been reported to the Company and are not aware of any facts or circumstances that would give rise to a claim that you suffered a workplace injury. You acknowledge that you have received any leaves of absence and any reasonable accommodations to which you were entitled under the Family and Medical Leave Act, the Americans with Disabilities Act, the Massachusetts Paid Family Leave Act, the North Carolina Equal Employment Practices Act (EEPA), Persons with Disabilities Protection Act (PDPA), and Retaliatory Employment Discrimination Act (REDA), N.C. Gen. Stat. §§ 143-422.2, 168A-3 through 168A-5, the Florida Civil Rights Act, or any other laws, regulations, rules or ordinances relating to medical leaves and accommodations and are not aware of any facts or circumstances that would give rise to a claim that you were denied any rights under such laws, regulations, rules or ordinances.

This release does not apply to: (a) your entitlement under ERISA to vested retirement or pension benefits; (b) enforcement of the terms of this Agreement; (c) any claims to workers' compensation benefits; (d) any claims for unemployment benefits; (e) any claims that may not be released by applicable law; and (f) any rights you may have to file, cooperate or participate in any proceeding before the Equal Employment Opportunity Commission ("EEOC") or a state fair employment practices agency, except, however, you waive any right to recover monetary damages in connection with any proceeding before the EEOC or a state fair employment practices agency.

5. Time to Consider Agreement; Revocation Period; Information Required By the Older Workers' Benefit Protection Act. You acknowledge that you have been given twenty-one (21) days to review and consider this Agreement. You acknowledge that the Company has advised you in writing to consult with an attorney of your own choice about this Agreement, including specifically the General Release, Waiver and Covenant Not to Sue set forth in Paragraph 4 before signing it. If you choose to negotiate the terms of this Agreement, any such negotiations shall not toll or extend the time to consider this Agreement.

Once you sign this Agreement, you will still have seven (7) additional days from the date you sign to revoke your acceptance ("Revocation Period"). If you decide to revoke this Agreement after signing and returning it, you must notify the Company in writing. You can send the written notice by electronic mail or registered mail, but no matter how you send it, the Company must receive your written notice no later than 5 p.m. on the seventh (7th) day after you sign this Agreement. Please address your written statement of revocation to:

Azurity Pharmaceuticals, Inc.
ATTN: Pete Dyke, CPO
900 Ridgefield, Dr.
Raleigh, NC 27609
Email: pete.dyke@azurity.com

Unless you revoke your acceptance within seven (7) days of signing this Agreement, the eighth day after you sign this Agreement shall be deemed the "Effective Date" of this Agreement.

6. Confidentiality of this Agreement. You agree to keep the terms of this Agreement confidential and not to disclose it to anyone unless required by law or by a court or other forum of competent jurisdiction. You may, however, discuss the terms of this Agreement with your spouse, attorney, and tax advisors, as long as they agree to keep the terms of this Agreement confidential.

7. Non-disparagement; Social Media; Relationship to the Company. You agree not to make or provide any derogatory, defamatory or negative statements or information to anyone, including through social media such as LinkedIn, Facebook, Twitter, Instagram, Yelp, or Glassdoor, about the Company and/or any of its Releasees or any of its or their respective services, products, directors, officers or employees, unless compelled to do so by law, or by an order of a court or other forum of competent jurisdiction, in which case you will notify the Company promptly to allow the Company sufficient time to intervene to stop you from being required to make such statements or information. You further agree to change all social media and other information, including your LinkedIn profile, no later than the Separation Date, to reflect that you are no longer an employee of the Company. After the Separation Date, you must refrain from representing to others or giving others the impression, whether directly or indirectly, that you are in any way an employee, agent or representative of the Company.

8. Nondisclosure. You acknowledge that the obligations set forth in the Non-Disclosure and Proprietary Rights Agreement between you and the Company continue in full force and effect now and after the Separation Date. You acknowledge that you may have obligations to protect the Company's trade secrets under the Defend Trade Secrets Act.

Notwithstanding the above, you understand that pursuant to the Defend Trade Secrets Act, an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if the individual: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

9. Nonadmission. This Agreement shall not be construed in any way to be an admission by the Company or any of the Releasees, and the Company and the Releasees specifically deny, that any of them have engaged in any wrongful or unlawful act with respect to you, your employment or the termination of your employment.

10. Cooperation; Return of Property. You agree to cooperate fully in the defense or prosecution of any claims or actions now in existence or which may be brought or threatened in the future against or on behalf of the Company about which you have knowledge or were involved by virtue of your employment with the Company, and in any claim or action brought by the Company against any other entity about which you have knowledge or were involved by virtue of your employment with the Company. You agree, to the extent necessary and requested, to cooperate fully in executing any documents, providing testimony, and otherwise performing any acts the Company requires from You, with reasonable approved expenses covered by Company, to ensure the Company retains, throughout the world, all intellectual property rights in the Company's proprietary works. You further agree that should you be contacted (directly or indirectly) by any individual or entity about matters that may be adverse to the business interests of the Company or any of the Releasees, you will promptly notify the Company of such contact including who contacted you and the substance of any such contact. **Within 24 hours after the Separation Date, you agree to return all of the Company's property, including your identification badge and any and all keys, passwords, external hard drives, laptops, phones, software, spreadsheets and any other property and/or information that you may have received, created, or accessed as an employee of the Company, including but not limited to any documents or data stored on any Company device or on any personal device. You agree not to retain any copies of any property, documents, spreadsheets or information, including but not limited to paper documents or items stored in any electronic format, which was made or compiled by you, or made available to you, relating to the Company, its clients or any of them.**

11. Breach. You agree that if you breach or threaten to breach the provisions of Paragraphs 4, 6, 7, 8, 9, 10, or 11 of this Agreement, the Company will suffer irreparable harm and, therefore the Company shall be entitled to equitable relief, including a preliminary and permanent injunction, without the need to post a bond or provide any other security, or motions to compel, to stop you from harming the Company, and to payment by you of all costs and attorneys' fees incurred by the Company in enforcing the provisions of this Agreement. The Company will also be entitled to all other remedies available to it by law.

12. Miscellaneous. This Agreement and the Non-Disclosure and Proprietary Rights Agreement constitute the entire agreement between you and the Company and supersedes all other agreements, whether written or oral, with respect to your employment, its termination and all related matters. **To be clear, this Agreement supersedes the Offer of Employment, between you and the Company.** This Agreement may only be modified or amended by a written document signed by both parties. If any part, term or provision of this Agreement is determined to be illegal, invalid or unenforceable, that term or provision will be stricken and the remaining parts, terms or provisions will remain in full force and effect. This Agreement will be governed by the laws of the Commonwealth of Massachusetts without regard to conflict of law principles. The parties agree to the exclusive jurisdiction of the state and federal courts located in Middlesex County, MA, and waive any defenses to personal or subject matter jurisdiction of such courts, to any disputes arising from or related to this Agreement or the enforcement of any of its terms. This Agreement shall be binding upon and inure to the benefit of the Company and its respective successors and assigns. This Agreement may be executed in duplicate counterparts, each of which shall be treated as an original, and signatures submitted in electronic format shall be considered originals.

13. Representations. You represent and agree that: (i) you have carefully read and understand this Agreement and, in particular, the General Release, Waiver and Covenant Not to Sue contained in Paragraph 5 of this Agreement, and fully understand the final and binding effect of same; (ii) you were advised to consult legal counsel before signing this Agreement and have had the opportunity to do so; (iii) you are not entitled to the consideration set forth in this Agreement, but for your signing this Agreement and not revoking it within the permitted timeframes; (iv) you are signing this Agreement knowingly and voluntarily and for reasons of your own; and (v) the Company has not made any representations inconsistent with the terms of this Agreement.

Please indicate your agreement to the terms of this Agreement by signing and returning to me a scanned copy of this letter **no later than 5:00PM on September 23, 2025**.

| **AZURITY PHARMACEUTICALS, INC.** | **SHEILA BHATTACHARYA** |
|---|---|
| [signature] ______________ | Signed by: Sheila Bhattacharya C962BA0FA482457... |
| By: Pete Dyke Its: CPO<br>Date: 9/2/25 | _Date: 9/12/2025 \| 1:47 PM EDT |

**ACKNOWLEDGMENT**
**[if signed before September 23, 2025]**

**I, Sheila Bhattacharya, acknowledge that I was informed and understand that I have been given at least twenty-one (21) days within which to consider this Agreement. I have been advised in writing of my rights to consult with an attorney of my choice and have done so or chosen not to do so. If I execute this Agreement prior to September 23, 2025, I acknowledge and agree by signing below that I have voluntarily decided to waive the remainder of the 21 days I was given to review this Agreement.**

Acknowledged and Agreed,

Signed by:
Sheila Bhattacharya
C962BA0FA482457...

9/12/2025 | 1:47 PM EDT

Sheila Bhattacharya

Date

# EXHIBIT C

azurity pharmaceuticals

***Sent via email***

July 22, 2022

Sheila Bhattacharya
1032 Royal Pass Road
Tampa, FL 33602

Dear Sheila,

We are very pleased to provide you with this letter confirming our offer of employment to you as **VP. Market Access and Strategic Accounts**, reporting to **Terrence Terifay, Chief Commercial Officer** at Azurity Pharmaceuticals, Inc. This offer is contingent on successfully meeting our pre-employment requirements: a favorable background check and drug testing.

The following are the components of your employment offer:
**Your anticipated start date will be August 15, 2022,** and your role will be **Remote.**

**Compensation –** $13,125, per pay period, annualized to **$315,000** per annum. You will be paid on a semi-monthly payroll schedule. This is a full-time, exempt position. You will be eligible to participate in the company performance-related bonus program, subject to achievement of company "True North" objectives, as well as departmental and individual ("True North") objectives. The annual bonus target for this role is **30%.** Whether or not a bonus is granted, and the amount of the grant is within the sole discretion of Azurity. Bonuses are based on individual merit, the Company's profitability and any other factor(s) deemed significant by the Company, including a requirement to be employed on the date of bonus payout. If your employment terminates prior to bonus payout, you will forfeit the entirety of the bonus.

- **Sign-on Bonus –** The Company will provide you with a sign-on bonus of **$30,000**, which will be payable on the next regularly scheduled payroll date after 30 days of employment. If you voluntarily terminate your employment at any time prior to the one (1) year anniversary of your employment with the company, you agree to reimburse the Company the full amount of this bonus within 30 days of the termination of your employment and grant the Company the right to withhold any and all outstanding payments from your pay.

- **Long-term Incentives –** You will be considered by the Compensation Committee of the Company's Board of Directors (the "Compensation Committee") for participation in the Company's current Equity Incentive Plan. The Compensation Committee will consider an option grant of **100,000** options to you. Any option grants offered will be subject to the approval of the Compensation Committee and final determination on the amount offered will be determined at the next official meeting of the Compensation Committee. The stock options shall fully vest over a period of employment, as will be described in a stock option agreement.

**Benefits Summary**– You will be eligible for all full-time employee benefits upon hire. We offer group health, dental, vision, life and disability plans. Once you are cleared through the pre-hire process, you will be introduced to all of our benefit offerings and information on how to enroll.

- **Holidays** –For 2022, we recognize 13 paid holidays.
- **PTO** – You will be eligible for up to 20 days of paid time off per year, prorated based on your hire date. PTO time will be "earned" per pay period.
- **401(k)** – You will be automatically enrolled in the company 401(k) plan after 90 days of employment. For the benefit of all colleagues, our plan auto-enrolls all new hires at a contribution rate of 5% of base salary. The company will also match your contributions at 100% up to 5%. You may increase, decrease, or cancel your contribution and match at any time.

**Corporate Policies** – As a condition of employment you will be expected to sign and abide by the Azurity confidentiality and non-disclosure agreement as well as various other policies including, but not limited to, the Proprietary Information and Inventions Agreement, Colleague Handbook Acknowledgement, Travel and Expense Policy, relevant standard operating procedures, etc.

**COVID-19 Vaccine Mandate** - Azurity Pharmaceuticals has adopted a mandatory COVID-19 vaccination policy to safeguard the health of our colleagues and their families, our customers and visitors, and the community at large. All new hires must show proof of vaccination or have received an exemption under the policy as an accommodation.

**At-Will Employment** – Azurity Pharmaceuticals, Inc. is an employment-at-will company. This means that this offer of employment is not and should not be considered a commitment to employment for an indeterminate period of time. Employment may be terminated by you or by the company at any time for any reason or no reason. Although other terms and conditions of employment may change, this at-will employment relationship will remain in effect throughout a colleague's employment with the Company, or any of its successor or affiliated companies, unless it is modified by a specific, express written employment contract, which is signed by the Chief Executive Officer and the colleague. This at-will employment may not be modified by any oral or implied agreement.

**Employment Eligibility Verification** - You must be able to show proof of employment eligibility in compliance with the requirements of the US Immigration Act.

Sheila, we look forward to you joining our team and creating success together!

Kindly print, sign and scan a copy of this letter to me by **July 25, 2022.**

Sincerely,

SBWeiland

Sherri Weiland
Chief Human Resource Officer

I accept the above offer of employment with Azurity Pharmaceuticals, Inc.

Signed: Sheila Bhatt    Date: July 22, 2022