UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AZURITY PHARMACEUTICALS, INC.,

Plaintiff,

v. Case No.: 8:26-cv-02391-TPB-NHA

SHEILA BHATTACHARYA AND
SHORLA ONCOLOGY, INC.,

Defendants.

---

**OPPOSITION TO DEFENDANT SHORLA ONCOLOGY, INC.'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**

Plaintiff Azurity Pharmaceuticals, Inc. submits this response to Defendant Shorla Oncology, Inc.'s *Motion to Dismiss Plaintiff's First Amended Verified Complaint and Application for Injunctive and Other Relief* (ECF No. 25). Shorla's Motion asks the Court to treat Shorla and its Chief Commercial Officer as strangers when they are not. Sheila Bhattacharya left Azurity with its confidential presentations in her personal email account and never returned them.

Months later, she became Chief Commercial Officer of Shorla, whose product, Jylamvo, competes directly with Azurity's Xatmep. About the same time, two of her former Azurity direct reports later forwarded Azurity's pricing, contracting, and Xatmep-related files to their personal accounts, resigned two weeks apart, and joined her team at Shorla. When Azurity sought emergency relief against one of them,

Bhattacharya contacted the court and appeared, suggesting she was there for both the employee and Shorla.

Shorla does not dispute that a corporation acts through its officers. It argues only that Azurity must plead more about what happened inside Shorla. But those facts are in Shorla's possession, and Azurity need not establish them at this stage. The Verified Amended Complaint alleges who, what, how, and for whose benefit, making the claims against Shorla plausible. The Court should therefore deny the Motion.

## PERTINENT ALLEGATIONS

### A. BHATTACHARYA'S TAKING OF AZURITY INFORMATION

Bhattacharya served as Azurity's Vice President of Market Access & Strategic Accounts. In that role, she supported multiple product lines and advanced enterprise-wide pricing, reimbursement, and access strategies. (*See* ECF No. 6 at ¶¶ 27-28). In her Confidentiality, Non-Solicitation and Intellectual Property Assignment Agreement (the "Agreement"), she agreed to keep no Confidential Information after leaving, to return all Company Records, and, for twelve months after separation, not to solicit Covered Workers for a competitor. (*See id.* at ¶ 32). The Agreement also presumes that she was involved in soliciting or hiring any Covered Worker whom a competitor places in a position reporting to her during that period. (*See id.* at ¶ 32).

Before leaving Azurity, Bhattacharya emailed Azurity documents to her personal account and never returned them. (*See id.* at ¶¶ 60, 63-64). These included an Azurity-commissioned commercial-due-diligence presentation marked confidential, which contained prescriber and payer insights, pricing and coverage research, and

product-utilization rates. (*See id.* at ¶ 65). They also included an oncology franchise review presentation covering budget, net revenues, actual and projected unit sales, regional performance, and top providers to target in each region. (*See id.* at ¶ 66). Based on the conduct of the employees who followed her to Shorla, it reasonably appears that she may have kept other Azurity documents and used and distributed the information without any authorization. (*See id.* at ¶¶ 72-73).

### B. BHATTACHARYA JOINS SHORLA AND RECRUITS GITOMER AND DEACON

Following her departure from Azurity, Bhattacharya became Shorla's Chief Commercial Officer, a member of its executive leadership team with authority over its commercial operations. (*See id.* at ¶¶ 1, 74, 92). Azurity and Shorla are direct competitors: both are specialty pharmaceutical companies. Shorla markets Jylamvo, a pediatric oral liquid methotrexate product that competes directly with Azurity's Xatmep. (*See id.* at ¶ 2).

Bhattacharya's former direct reports at Azurity followed her to Shorla, first Michael Gitomer on June 5, 2026, and then Kimberly Deacon on June 19, 2026, joining her team at Azurity's competitor during the twelve-month non-solicitation period. (*See id.* at ¶¶ 32, 60, 76). Before leaving, both Deacon and Gitomer each forwarded Azurity proprietary information to their personal email accounts. (*See id.* at ¶ 77). Among other materials, Deacon forwarded documents referencing Xatmep, the direct competitor to Shorla's Jylamvo. (*See id.* at ¶ 79). Based on that timing and those and subsequent circumstances, Azurity alleges that Bhattacharya solicited Gitomer

and Deacon to join Shorla and plotted with them to take Azurity's information for their own benefit and for the benefit of Shorla. (*See id.* at ¶ 82).

### C. THE CEASE-AND-DESIST LETTER AND THE TRO HEARING

On August 7, 2026, Azurity sent Bhattacharya a cease-and-desist letter informing her that she had forwarded Azurity information to her personal emails and demanding, among other things, that she return the information, submit her accounts and devices for forensic examination, and certify that she had not disclosed Azurity information to Shorla. (*See id.* at ¶¶ 84-86). She did not respond by the deadline, or at all. (*See id.* at ¶ 87). Azurity then sued Gitomer and Deacon in Pennsylvania and sought temporary restraining orders. (*See id.* at ¶¶ 9, 88).

The TRO hearing against Deacon was held on August 18, 2026, the next business day after suit was filed. (*See id.* at ¶ 89). Bhattacharya, having learned of the suit, contacted chambers and asked to participate. (*See id.* at ¶ 90). When the court asked what role she would play, she implied that she was attending for both Deacon and Shorla because the counsel Shorla had originally selected to appear had a conflict. (*See id.* at ¶ 91). She then described herself as merely "a co-worker" at Shorla, even though she is Shorla's Chief Commercial Officer. (*See id.* at ¶ 92). Azurity alleges that her solicitation of Azurity employees, her participation in the TRO hearing, and her facilitation of the misappropriation were undertaken within the scope of her employment as Shorla's Chief Commercial Officer and in furtherance of Shorla's business interests. (*See id.* at ¶¶ 93-94).

### D. THE CLAIMS AGAINST SHORLA

Counts I and II allege that Shorla misappropriated Azurity's trade secrets by accepting Bhattacharya's disclosures and her retention and use of the information, and that Shorla knew or should have known that she was prohibited from retaining or using it. (*See id.* at ¶¶ 117, 119, 135, 137). Count IV alleges that Bhattacharya and Shorla knowingly and unjustifiably interfered with Azurity's relationships with its employees, including specifically Gitomer and Deacon, and with its current customers and vendors, and that those efforts are continuing. (*See id.* at ¶¶ 151-56). Count V alleges that Bhattacharya and Shorla substantially assisted Gitomer's and Deacon's breaches of their duty of loyalty by soliciting them, providing the employment opportunity that incentivized the taking, directing, or encouraging them to retain competitively useful categories of information, and seeking to shield them from the consequences through the TRO proceedings. (*See id.* at ¶¶ 161-67).

Taken together, these allegations describe one course of conduct. The Court should consider them together and not separately, as Shorla's Motion attempts to.

## LAW AND ARGUMENT

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). It is well recognized that, in reviewing the sufficiency of a complaint, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

On a motion to dismiss pursuant to Rule 12(b)(6), this Honorable Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. *See Datto, Inc. v. Moore*, 8:20-CV-2446-T-33TGW, 2020 WL 7318957, at *3 (M.D. Fla. Dec. 11, 2020) (citing *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004)). The Court also favors the plaintiff with all reasonable inferences from the allegations. *Datto,* 2020 WL 7318957 at *3 (citing *Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990)).

Here, Shorla's Motion rests on one premise: that Azurity has alleged conduct by Bhattacharya, but not by Shorla. (*See* Mot. at pp. 2-3). That premise fails. When a corporate officer acts within the scope of her job, her conduct is the corporation's conduct. In fact, Shorla concedes the hornbook agency principle that "a corporation may act through an employee." (*See* Mot. at p. 2). It also concedes that Azurity need not allege that Bhattacharya passed a file to a second Shorla employee. (*See* Mot. at p. 5). The question, then, is narrow: does the Verified Amended Complaint plausibly allege that Bhattacharya, acting as Shorla's Chief Commercial Officer, took part in acquiring, using, or benefiting from Azurity's information and employees? It does.

Section A explains why that conduct states claims for misappropriation under the DTSA and FUTSA. Section B shows that the same conduct states a claim for tortious interference. Section C also states a claim for aiding and abetting the employees' breaches of loyalty. Section D explains why, if the Court finds any insufficiency in the pleading, the proper remedy should be amendment, which Shorla acknowledges.

## A. AZURITY HAS PLAUSIBLY PLEADED MISAPPROPRIATION

Counts I and II state claims against Shorla. Both statutes reach a company that acquires a trade secret while knowing, or having reason to know, that it was taken by improper means. The Verified Amended Complaint pleads that Shorla did just that, through its own Chief Commercial Officer.

### 1. The DTSA and FUTSA Reach a Later Acquirer

Under the DTSA and FUTSA, a claim for misappropriation may exist not only where a defendant herself is alleged to have stolen trade secrets, but also where a defendant is alleged to have obtained the trade secrets while knowing ***or having reason to know*** that they were acquired by improper means. *See* 18 U.S.C. § 1839(5)(A) (defining misappropriation as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"); *see also* Fla. Stat. Ann. § 688.002(2); *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1294-95 (M.D. Fla. 2018) (one defendant alleged to know that improper means were used to obtain trade secrets under the DTSA); *Adams Arms, LLC*

*v. Unified Weapon Sys.*, No. 8:16-CV-1503-T-33AEP, 2016 WL 5391394, at *5 (M.D. Fla. Sept. 27, 2016) ("Pursuant to [the] DTSA, prohibited 'misappropriation' includes both the acquisition of a trade secret and its disclosure."); *N. Palm Motors, LLC v. Custom Fleet Servs., Inc.*, 2026 WL 2931203, at *18 (Fla. Dist. Ct. App. Sept. 30, 2026) (observing that liability for misappropriation by acquisition is not limited to the original acquirer and can include a later acquirer who knows or has reason to know that the trade secret was acquired by improper means).

Here, Azurity alleges, as well-pleaded facts that must be accepted as true, that Bhattacharya's role as Azurity's Vice President of Market Access & Strategic Accounts involved advancing pricing, reimbursement, and access strategies. (*See* ECF No. 6 at ¶¶ 27-28). Now, as Shorla's Chief Commercial Officer, she has authority over Shorla's commercial operations. (*See id.* at ¶¶ 74, 92). Before leaving Azurity, she emailed herself Azurity presentations containing prescriber and payer insights, pricing and insurance-coverage research, product-utilization rates, net revenues, unit sales, regional performance, and the top health care providers to target in each region. (*See id.* at ¶¶ 63-66). That is precisely the information that would allow her to compete against Azurity. (*See id.* at ¶¶ 1-2, 75). The Verified Amended Complaint also alleges that Bhattacharya helped orchestrate Gitomer's and Deacon's departures, and, based on reasonable inferences, coordinated their further misappropriation of Azurity's trade secrets for the benefit of Shorla. (*See id.* at ¶¶ 76-82).

When the alleged actor is the executive who runs a company's commercial operations, as is the case here, the link between the actor and the company is not

missing. Bhattacharya is not a low-level employee acting under the radar. She sits at the top of Shorla's commercial organization and is a member of its executive leadership team. (*See id.* at ¶¶ 1, 92). Under Florida law, a corporate officer's knowledge is generally imputed to the corporation. *See Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998); *see also Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. Dist. Ct. App. 1992) (imputing officer's intentional misconduct to the company where the officer knew of it and the company benefited). Bhattacharya's acts on Shorla's commercial business are therefore Shorla's acts.

The alleged conduct also falls within the scope of Bhattacharya's employment. Under the test Shorla itself cites, an employee acts within the scope of employment when the conduct (i) is the kind she was hired to perform, (ii) occurs substantially within authorized time and space limits, and (iii) is motivated at least in part by a purpose to serve the employer. *See McGhee v. Volusia Cnty.*, 679 So. 2d 729, 732-33 (Fla. 1996); *Ibarra v. Ross Dress for Less, Inc.*, 350 So. 3d 465, 467-68 (Fla. Dist. Ct. App. 2022); *See also* Mot. at p. 9. Recruiting talent and representing Shorla's interests are exactly the kind of work a Chief Commercial Officer performs. (*See* ECF No. 6 at ¶ 94). The Verified Amended Complaint alleges that Bhattacharya solicited her former Azurity direct reports to join her own commercial team at Shorla, and that she did so within the scope of her employment and in furtherance of Shorla's business. (*See id.* at ¶¶ 76, 82, 94).

There is no logic in the contention that she acted only for herself when she recruited people she had managed onto the counterpart team at her new employer.

She did not recruit them to serve as personal assistants, to clean her house, to mow her lawn, or babysit her children. She recruited them to work on her commercial team at Shorla, a direct competitor, which served Shorla's interests, not a personal one.

**2. Shorla Is Liable for What Bhattacharya Did After She Joined Shorla**

Shorla argues that Bhattacharya's 2025 emails to her personal account were sent before she joined Shorla and therefore cannot be charged to Shorla. (*See* Mot. at p. 9). But, Azurity does not seek to hold Shorla liable for the moment Bhattacharya first forwarded the files. Rather, it seeks to hold Shorla liable for what happened afterward, which the law allows. *See* 18 U.S.C. § 1839(5); Fla. Stat. Ann. § 688.002(2); *see also N. Palm Motors, LLC v. Custom Fleet Servs., Inc.,* No. 4D2025-0167, 2026 WL 2931203 at *18 (Fla. Dist. Ct. App. Sept. 30, 2026).

Here, the Verified Amended Complaint pleads conduct after Bhattacharya joined Shorla. She became Shorla's Chief Commercial Officer while still holding Azurity's commercial due-diligence and franchise-review presentations, which she never returned. (*See* ECF No. 6 at ¶¶ 63-66, 74, 87). In that role, she has authority over the commercial operations of a company (Shorla) whose product (Jylamvo) competes head-to-head with Azurity's product (Xatmep). (*See id.* at ¶¶ 75, 92). Her former Azurity direct reports forwarded Azurity pricing, contracting, account, and Xatmep-related materials to personal accounts and then joined her team at Shorla. (*See id.* at ¶¶ 76-80).

Building a commercial team, competing for market share, and protecting the company's interests are the core work of a Chief Commercial Officer. The Verified

Amended Complaint alleges that Bhattacharya's conduct was within the scope of her employment and in furtherance of Shorla's business. (*See id*. at ¶ 94). That is enough to plead that Shorla, acting through its senior officer, acquired Azurity's trade secrets and is positioned to use them. Pointedly, a competitor whose top commercial officer holds a rival's unreturned pricing and targeting data and will not account for it presents a threat to Azurity that the Court is authorized to enjoin. (*See id*. at ¶¶ 86-87, 121, 139). *See* 18 U.S.C. § 1836(b)(3)(A); Fla. Stat. Ann. § 688.003(1).

**3. Shorla's Knowledge Is Pleaded**

Because Shorla acquired the information through its own officer, the next question is what Shorla knew. Shorla argues that it lacked knowledge because Azurity sent its cease-and-desist letter only to Bhattacharya. (*See* Mot. at pp. 2, 6). But a letter to Shorla's Chief Commercial Officer about her own conduct is notice to Shorla. *See Beck*, 144 F.3d at 736. In any event, she needed no letter. She took the information herself after agreeing in writing not to keep any Confidential Information and to return all Company Records. (*See* ECF No. 6 at ¶¶ 32, 64-66). Her knowledge that she held Azurity's information, and that she was barred from keeping it, is Shorla's knowledge.

The Verified Amended Complaint also pleads Shorla's knowledge apart from imputation through Bhattacharya. At Deacon's TRO hearing, which concerned Deacon's taking of Azurity information, Bhattacharya indicated that she was attending for both Deacon and Shorla because counsel *originally selected by Shorla* had

a conflict. (*See* ECF No. 6 at ¶¶ 88-89, 91). So, as alleged, Shorla knew that Azurity accused its new employee of taking trade secrets by August 18, 2026, if not earlier.

Shorla may dispute what it knew and when, but a motion to dismiss is not the appropriate means to resolve such factual disputes. *See Preferred Drilling Solutions, Inc. v. Bonacum*, No. 8:25-CV-806-MSS-CPT, 2026 WL 776202, at *7 (M.D. Fla. Mar. 19, 2026) (refusing to dismiss trade-secret claims against a former employee and his new employer. It held that whether the former employee actually used or disclosed trade secrets to the new employer, and whether the new employer knew or had reason to know of their source, are issues more properly resolved at the summary judgment stage).

**4. The Information-and-Belief Allegations Rest on Specific Facts**

Shorla also attacks Paragraph 82 because it rests on information and belief and on "timing and circumstances." (*See* Mot. at pp. 2, 8). But Shorla concedes that pleading on information and belief is proper when the facts are in the defendant's control, as long as the belief rests on facts that make the claim plausible. (*See* Mot. at pp. 4-5 (citing *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013); *Direct Components, Inc. v. Microchip USA, LLC*, No. 8:23-CV-1617-VMC-SPF, 2024 WL 1929522, at *6 (M.D. Fla. May 2, 2024))). The communications among Bhattacharya, Gitomer, Deacon, and Shorla are in defendants' hands, not Azurity's.

Unlike in *Direct Components*, Azurity's belief rests on specific, verified facts, and reasonable inference from those facts. Bhattacharya emailed Azurity's confidential

presentations to her personal account and never returned them. (*See* ECF No. 6 at ¶¶ 63-66). Her two former direct reports later did the same thing, forwarding Azurity files to their personal accounts before resigning. (*See id*. at ¶¶ 77-80). They left Azurity two weeks apart, and both joined her team at a direct competitor. (*See id*. at ¶¶ 75-76). The files Deacon took referenced Xatmep, the product that competes with Shorla's Jylamvo. (*See id*. at ¶ 79). Bhattacharya ignored Azurity's demand that she account for its information. (*See id*. at ¶¶ 84-87). She then contacted the court to take part in Deacon's TRO hearing. (*See id*. at ¶¶ 89-93). That conduct creates a reasonable inference about conduct which create plausible claims.

**5. Shorla's Other Cases Do Not Support Dismissal**

Shorla's remaining cases do not support dismissal. (*See* Mot. at pp. 7-8 (citing *Datto, Inc. v. Moore*, 2020 WL 7318957 (M.D. Fla. Dec. 11, 2020); *Bayport Fin. Serv. (USA) Inc. v. BayBoston Managers, LLC*, No. 1:22-CV-21306-JEM, 2023 WL 2633298 (S.D. Fla. Mar. 3, 2023), *report and recommendation adopted*, No. 22-21306-CIV, 2023 WL 2631502 (S.D. Fla. Mar. 24, 2023); *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1289 (M.D. Fla. 2018)).

Shorla distinguishes *Datto* by pointing to USB devices and post-employment file access. (*See* Mot. at p. 7). But *Datto* inferred use because the employee joined a direct competitor in a substantially overlapping role. *Datto*, 2020 WL 7318957, at *8. So too here, as Bhattacharya moved from Azurity to Shorla in a similar type of position, keeping information a rival could use. (*See* ECF No. 6 at ¶¶ 28, 59, 65-70, 74, 92).

Shorla relies on *Bayport* to require allegations of who communicated with whom and how the corporate defendant entered the scheme. (*See* Mot. at pp. 7-8). The Verified Amended Complaint alleges both that Bhattacharya brought her two former direct reports onto her Shorla team, and each forwarded Azurity files to a personal account just before resigning to join Shorla. (*See* ECF No. 6 at ¶¶ 64, 74-82, 92-94).

Finally, *Trinity Graphic* bolsters Azurity's position. Shorla says it underscores the need to allege conduct by the corporate defendant (*See* Mot. at p. 8), but the court there left the factual dispute for a later stage. *See Trinity Graphic*, 320 F. Supp. 3d at 1293. Thus, dismissal is not warranted.

**6. Ratification Is an Alternative Basis for Liability**

Azurity does not need ratification to state its claims, because Bhattacharya acted within the scope of her job as Shorla's Chief Commercial Officer, which makes her conduct Shorla's conduct. (*See* ECF No. 6 at ¶ 94). Ratification is an alternative basis for liability, and the Verified Amended Complaint pleads facts that support it. Shorla's executive in charge of commercial operations knew what she had taken. (*See id.* at ¶¶ 64-66, 92). By August 18, 2026, Shorla knew that Azurity accused Deacon, at the very least, of taking Azurity's trade secrets. (*See id.* at ¶¶ 88-91). Yet Shorla did not distance itself from that conduct. Instead, Bhattacharya appeared at the hearing on behalf of Deacon and Shorla, while Deacon worked on Bhattacharya's team. (*See id.* at ¶¶ 76, 90-93). Whether these facts prove ratification is a question of fact for a later stage.

**7. The Verified Amended Complaint Gives Shorla Fair Notice**

Finally, Shorla argues that the "and/or" wording in Counts I and II leaves it unsure what it is charged with. (*See* Mot. at p. 10). Yet Shorla's own Motion correctly describes the theory: Shorla accepted Bhattacharya's disclosure, retention, or use of Azurity's trade secrets, knowing she was barred from keeping them. (*Compare* Mot. at pp. 2, 4, *with* ECF No. 6 at ¶¶ 94, 117, 119, 135, 137). The Federal Rules expressly permit pleading in the alternative. FED. R. CIV. P. 8(d)(2)-(3). Alleging acquisition, use, or both simply reflects that the details of Shorla's internal use are in its own files.

## B. AZURITY HAS PLAUSIBLY PLEADED TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

The same facts that state a misappropriation claim also state a claim for tortious interference. Count IV does not depend on whether the information taken qualifies as a trade secret. It rests on a simpler wrong: Shorla's Chief Commercial Officer recruited Azurity's employees in breach of her contract. To succeed on this claim, a plaintiff must prove: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *See W.D. Sales & Brokerage LLC v. Barnhill's Buffet of Tenn., Inc.*, 362 F. App'x. 142, 143 (11th Cir. 2010) (applying Florida law). Azurity's claim rests on its relationships with its *employees*, including Gitomer and Deacon, not with the market at large.

The Verified Amended Complaint alleges that Bhattacharya, as Shorla's Chief Commercial Officer, solicited her former direct reports to leave Azurity and join her

team at Shorla. (*See* ECF No. 6 at ¶¶ 76, 82, 94, 154). As explained in Section A, when a senior executive recruits employees for her company, she acts for the company, so Azurity need not allege a second Shorla actor.

Competitors may compete fairly for employees, but they may not use improper means. Here, the interference came through Bhattacharya's breach of her non-solicitation covenant, and it coincided with the employees' taking of Azurity's confidential files. (*See id.* at ¶¶ 32, 77-82, 155). That, alongside encouraging and abetting the taking of a rival's trade secrets, is not privileged competition. At the least, this is a fact question that cannot be decided on a motion to dismiss.

Nor is Count IV displaced by FUTSA. Shorla concedes that, to the extent Count IV rests on recruitment independent of trade-secret misuse, it is not necessarily displaced. (*See* Mot. at p. 11). That is Azurity's theory. Bhattacharya's solicitation of Gitomer and Deacon breached her non-solicitation covenant whether or not the files they took qualify as trade secrets. (*See* ECF No. 6 at ¶¶ 32, 76, 82, 154).

As to damages, Azurity lost two members of its Strategic Accounts team, along with the customer relationships and goodwill they were entrusted to maintain. (*See id.* at ¶¶ 50, 57, 76, 157). The Agreement itself recognizes that losing a Covered Worker is a real and measurable harm. (*See id.* at ¶ 32). That is enough to plead causation and damages.

At the same time, Azurity's customer and vendor allegations are an added basis for Count IV, not its foundation. Azurity alleges that Defendants attempted to divert business from its current customers, including hospitals, healthcare providers,

specialty pharmacies, and distributors. The files taken by Gitomer and Deacon include account trackers and contact lists for specific health-system and pharmacy accounts. (*See id*. at ¶¶ 23, 78, 80, 151, 154). These are identifiable relationships, not the market theory rejected in *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814-15 (Fla. 1994). And even if the Court finds that this part of Count IV needs more detail, which is denied, the proper remedy is leave to amend as opposed to dismissal.

### C. Azurity Has Plausibly Pleaded a Claim for Aiding and Abetting Breach of Fiduciary Duty

The recruitment of Gitomer and Deacon did more than interfere with Azurity's relationships with them. It also helped bring about the breaches of loyalty they committed on their way out, as alleged in Count V. Shorla argues that nothing ties Shorla to Gitomer's and Deacon's conduct at the time they forwarded Azurity's files. (*See* Mot. at pp. 11-12). But the person alleged to have solicited them, placed them on her team, and encouraged their taking was Bhattacharya, Shorla's Chief Commercial Officer.

*Otto Candies* makes clear that, in pleading knowledge, "general allegations are sufficient," and the only question is whether "the plaintiff pleads factual content that allows the court to draw the reasonable inference" that the defendant had knowledge. *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1179-80 (11th Cir. 2025). Shorla agrees that knowledge may be alleged generally, so long as the surrounding facts make it plausible. (*See* Mot. at p. 11). The surrounding facts here do just that. Similarly, Shorla's reliance on *Aquent* is also misplaced, as *Aquent* applied the same pleading

standard to more egregious facts, but it did not make those facts the minimum Azurity must plead. *See Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1350-52 (M.D. Fla. 2014). There is a well-pleaded inference that Bhattacharya, acting for Shorla, coordinated their departures and the related takings.

Ultimately, Shorla's main point goes back to timing, arguing that nothing shows Shorla knew of or assisted the employees' transfers when they happened. (*See* Mot. at pp. 11-12). But the Verified Amended Complaint alleges that the transfers happened on or around the time Bhattacharya was recruiting both employees to her team. (*See* ECF No. 6 at ¶¶ 76-82, 165-66). From her years at Azurity, Bhattacharya knew what information these employees could reach and what duties they owed. (*See id.* at ¶ 164). She offered them roles on her team at a direct competitor, and they forwarded Azurity's pricing, contracting, and Xatmep-related files before resigning. (*See id.* at ¶¶ 78-80, 166). These facts support a reasonable inference that Shorla, through Bhattacharya, knew of and encouraged the breaches.

Once again, Bhattacharya's conduct at the TRO hearing provides strong circumstantial evidence of what came before. Bhattacharya learned of an emergency hearing scheduled for the next business day after suit was filed. She contacted chambers on her own. (*See id.* at ¶¶ 89-93). A stranger to the issues would not have known of the hearing, much less stepped forward as Bhattacharya did. That conduct supports the inference that Bhattacharya, and through her Shorla, knew of and coordinated or encouraged the employees' conduct. (*See id.* at ¶ 93). Added to that, as

alleged, by acting to shield Deacon, Shorla encouraged the continued retention and misuse of Azurity's information. (*See id.* at ¶ 167).

Finally, Count V is not displaced by FUTSA. Its core theory, that Shorla (through Bhattacharya) solicited Gitomer and Deacon and provided the employment opportunity that incentivized their disloyal conduct, does not depend on whether the information they took qualifies as a trade secret. (*See id.* at ¶¶ 165-66; *see also* Mot. at pp. 11-12 (effectively treating the recruitment as an independent theory not subject to FUTSA displacement)).

### D. In the Alternative, if Additional Factual Allegations are Required, Azurity Should Be Afforded Leave to Amend

Azurity's claims are well pleaded, and the Motion should be denied. But if the Court finds any part of a claim insufficient, any dismissal should be without prejudice and with leave to amend. *See Lucas v. USAA Cas. Ins. Co.*, 716 F. App'x 866, 870 (11th Cir. 2017) (observing that a plaintiff should generally receive at least one chance to amend before a claim is dismissed with prejudice). Shorla itself asks, in the alternative, for targeted repleading. (*See* Mot. at pp. 12-13). Azurity does not agree that the items Shorla lists are required at this stage, especially since several involve facts in defendants' possession. But Shorla's request confirms that the proper remedy for any perceived insufficiency is amendment and not dismissal.

## CONCLUSION

Shorla asks the Court to treat it and its Chief Commercial Officer as strangers. Neither the law nor the facts allow that. Bhattacharya left Azurity with its confidential

commercial information, took a top commercial role at a direct competitor, brought her former team and their copies of Azurity files to Shorla, and then appeared in court for one of them on Shorla's behalf. These facts plausibly state claims against Shorla for misappropriation (Counts I and II), tortious interference (Count IV), and aiding and abetting breaches of loyalty (Count V). Shorla's disputes over what it knew and did belong in discovery, not on a motion to dismiss. Azurity therefore respectfully requests that the Court deny Shorla's Motion to Dismiss (ECF No. 25) in its entirety. Alternatively, Azurity requests that any dismissal be without prejudice, with leave to file a second Verified Amended Complaint within 14 days.

DATED: November 25, 2026

Respectfully submitted,

***/s/ John C. Getty***

**John C. Getty, Esq.**
**Florida Bar No. 1013911**
**john.getty@ogletree.com**
**Parker E. Thoeni, Esq.**
admitted *pro hac vice*
parker.thoeni@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
100 North Tampa Street, Suite 3600
Tampa, Florida 33602
T:813-289-1247; F:813-289-6530
*Attorneys For Plaintiff*